**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

GREGORIO PEREZ CRUZ,

*Petitioner*,

v.

WILLIAM P. BARR, Attorney General,

*Respondent.*

No. 15-70530

Agency No.
A095-748-837

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted September 5, 2018
San Francisco, California

Filed June 13, 2019

Before: Marsha S. Berzon and Michelle T. Friedland,
Circuit Judges, and Daniel R. Dominguez,* District Judge.

Opinion by Judge Berzon

---

*The Honorable Daniel R. Dominguez, United States District Judge
for the District of Puerto Rico, sitting by designation.

# SUMMARY[**]

## Immigration

Granting Gregorio Perez Cruz's petition for review of a decision of the Board of Immigration Appeals, the panel held that Immigration and Customs Enforcement (ICE) agents were not permitted to carry out preplanned mass detentions, interrogations, and arrests at a factory, without individualized reasonable suspicion, and reversed and remanded to the BIA with instructions to dismiss Perez Cruz's removal proceedings without prejudice.

During the execution of a search warrant for employment-related documents located at the factory where Perez Cruz worked, he was detained, interrogated, and arrested for immigration violations, along with approximately 130 other workers. He was subsequently placed in removal proceeding and charged with entry without inspection. Based on statements he provided during his detention, ICE prepared a Form I-213, alleging that Perez Cruz had admitted that he was brought illegally into the United States as a child. The government also produced Perez Cruz's birth certificate based on statements he provided in connection with the factory raid. Perez Cruz moved to terminate the proceedings or, in the alternative, suppress evidence, but the BIA concluded that his detention and interrogation violated neither the agency's regulation nor the Fourth Amendment.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel first rejected the government's contention that, even if Perez Cruz were otherwise entitled to suppression, the critical evidence in question constituted evidence only of "identity" and so was not subject to suppression under *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984). The panel concluded that this argument was flatly contradicted by *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012 (9th Cir. 2008), which held that evidence pertaining to alienage is subject to suppression, and expressly instructed that, however broadly identity evidence reaches, it does not include evidence pertaining to alienage. Concluding that Perez Cruz's statements regarding his birthplace, and his birth certificate derived from those statements, constituted evidence of alienage—not identity—the panel rejected the government's argument that the evidence was not suppressible.

The panel next rejected the government's contention that Perez Cruz's detention was permitted by *Michigan v. Summers*, 452 U.S. 692 (1981), which held that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.

The panel held that *Summers*' categorical authority to detain incident to the execution of a search warrant does not extend to a preexisting plan whose central purpose is to detain, interrogate, and arrest a large number of individuals without individualized reasonable suspicion. In concluding that the purpose behind the agents' conduct was relevant here, the panel explained that the purpose behind a search or seizure is often relevant when suspicionless intrusions pursuant to a general scheme—such as inventory and administrative searches—are at issue. The panel also explained that there is no meaningful difference between the categorical authority to detain without reasonable suspicion

under *Summers* and the suspicionless intrusions for which the Supreme Court has held that a valid purpose is a prerequisite.

The panel further observed that, in the context of determining whether an administrative search is invalid due to an impermissible purpose, the court asks whether the officer would have made the stop in the absence of the impermissible purpose. The panel concluded that Perez Cruz had satisfied this burden, explaining that ICE planning documents showed that the central purpose of the raid was not to find documents but to arrest undocumented workers.

Accordingly, the panel concluded that Perez Cruz's seizure was not a permissible *Summers* detention and that the agents therefore violated 8 C.F.R. § 287.8(b)(2), which requires an immigration officer to have "reasonable suspicion, based on specific articulable facts, that a person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States" in order to briefly detain the person for questioning. Noting that prejudice may be presumed where—as here—compliance with a regulation is mandated by the Constitution, the panel presumed prejudice and concluded that Perez Cruz was entitled to suppression of the evidence in question.

Finally, the panel concluded that the proceedings should be terminated without prejudice because the government had not offered any evidence of Perez Cruz's alienage beyond the Form I-213 and his birth certificate—fruits of the regulatory violation. The panel thus granted the petition for review and remanded to the BIA with instructions to dismiss his removal proceedings without prejudice.

## COUNSEL

Ahilian T. Arulanantham (argued), Sameer Ahmed, ACLU of Southern California, Los Angeles, California; Noemi G. Ramirez, Los Angeles, California, for Petitioner.

Walter Bocchini (argued), Trial Attorney, Linda S. Wernery, Assistant Director, Office of Immigration Litigation; Chad A. Readler, Acting Assistant Attorney General, United States Department of Justice, Washington, D.C., for Respondent.

Kristin Macleod-Ball, Melissa Crow, American Immigration Council, Washington, D.C.; Matthew E. Price, Jenner & Block LLP, Washington, D.C., for Amicus Curiae American Immigration Council.

---

## OPINION

BERZON, Circuit Judge:

Immigration and Customs Enforcement (ICE) agents implemented a preconceived plan to "target" over 200 factory workers for detention and for interrogation as to their immigration status. The plan turned on obtaining and executing a search warrant for employment records at the factory. The record before us establishes that the search warrant for documents was executed "in order to" arrest undocumented workers present at the factory. Our central question is whether the ICE agents were permitted to carry out preplanned mass detentions, interrogations, and arrests at the factory, without individualized reasonable suspicion. We hold that they were not.

# I

## A

In March 2006, ICE received an anonymous tip that Micro Solutions Enterprises (MSE), a Los Angeles-area manufacturer of printer cartridges, employed 200 to 300 undocumented immigrants. Nearly two years later, in February 2008, ICE agents sought and received a search warrant for employment-related documents located at the MSE factory in Van Nuys, California, and criminal complaints and arrest warrants for eight MSE employees.[1]

Documents later obtained[2] revealed that ICE intended from the outset to turn the execution of these warrants into quite a different operation than a search for employment records. An internal memorandum issued before the operation stated that ICE "[would] be conducting a search warrant and expects to make 150–200 arrests." The memorandum also noted that ICE would have "2 buses and 5 vans" ready to transport potential detainees from the factory and "200 detention beds available to support the operation." Another planning document noted that ICE "anticipate[d] executing a federal criminal search warrant at

---

[1] The record does not reflect why ICE took so long to act on the anonymous tip.

[2] These documents were obtained by the ACLU of Southern California and the Los Angeles Chapter of the National Lawyers Guild as a result of a Freedom of Information Act (FOIA) request by the National Immigration Law Center, made after the MSE factory search. The request resulted in a settlement providing for the release of these documents, among others. *See* Order, *Nat'l Immigration Law Ctr. v. U.S. Dep't of Homeland Sec.*, No. 2:08-cv-07092-DDP-VBK (C.D. Cal. Feb. 1, 2011), ECF No. 33.

MSE *in order to* administratively arrest as many as 100 unauthorized workers" (emphasis added).

## B

The operation took place as planned. Two days after the warrants were issued, approximately 100 armed and uniformed ICE agents streamed into the MSE factory. Blocking all visible exits, the agents ordered all workers to stop working and announced that no one was permitted to leave. The agents prohibited the workers from contacting anyone using their cellphones and allowed them to use the restroom only with an ICE escort. Among the workers detained was Gregorio Perez Cruz, a native and citizen of Mexico who entered the United States without inspection in 1994.

The ICE agents then separated the men and women into different areas. The women were taken to the factory cafeteria, and the men were instructed to wait in a large hallway outside the cafeteria. After the men, including Perez Cruz, had gathered in the hallway, the agents ordered them to form two lines, one for individuals who possessed work authorization documents and another for those who lacked work authorization. Those who joined the line for men who had work authorization were escorted out of the hallway. Perez Cruz remained in the hallway but did not join either line.

The ICE agents next ordered Perez Cruz and the other remaining men to stand against the wall. While Perez Cruz and the others were standing the agents conducted a pat down of each of them. The agent who frisked Perez Cruz took his wallet. The detainees were then handcuffed and questioned. While Perez Cruz was handcuffed, the agents asked him his name, his nationality, his date of birth, and the

length of time he had worked at the factory. The agents then escorted Perez Cruz and the other detained male workers into another hallway, where they were questioned again. At some point during his detention, Perez Cruz provided statements to the agents indicating that he lacked lawful immigration status.

Sometime later, the ICE agents began taking groups of workers to buses parked outside the factory. When it came time for Perez Cruz to board the bus, an agent photographed him and asked again for his name and country of origin. Perez Cruz, still handcuffed, was kept on the bus for over an hour before he was taken to a detention facility in downtown Los Angeles.

When the bus arrived at the detention facility, ICE agents ordered Perez Cruz off the bus, searched him again, and removed his handcuffs. Perez Cruz was then held at the detention facility overnight. During the night, he was interrogated again. The next day, still detained, Perez Cruz was interrogated once more. At around 1:00 a.m. he was released. According to a later ICE press release, Perez Cruz was one of 130 workers at the MSE factory arrested for immigration violations.

## C

About a month later, Perez Cruz received a notice to appear for a removal hearing. The notice charged him as removable for entry without inspection. Based on the statements Perez Cruz provided during his detention, ICE agents prepared a Form I-213 alleging that Perez Cruz had admitted that he was brought illegally into the United States as a child. In addition to the Form I-213, the government produced Perez Cruz's birth certificate, obtained by an ICE

agent in Mexico based on the statements Perez Cruz had provided in connection with the factory raid.

Perez Cruz moved to terminate the proceedings or, in the alternative, suppress the evidence gathered, arguing that his arrest and interrogation violated binding federal regulations as well as the Fourth and Fifth Amendments. There was a brief hearing on Perez Cruz's motions, during which the government did not contest any of Perez Cruz's factual assertions. The immigration judge (IJ) granted Perez Cruz's motion to terminate, concluding that ICE's initial detention of Perez Cruz and failure to advise Perez Cruz of his rights "violated [ICE's] own regulation." Relying on *Matter of Garcia-Flores*, 17 I. & N. Dec. 325 (B.I.A. 1980), the IJ held that, because Perez Cruz was prejudiced by this regulatory violation, termination of his removal proceedings was warranted. Accordingly, the IJ did not reach Perez Cruz's constitutional claims.

The government appealed, and the Board of Immigration Appeals (BIA) reversed. The BIA relied on *Michigan v. Summers*, 452 U.S. 692 (1981), which held valid the detention of residents of a home where a search warrant was being executed. Under *Summers*, the BIA concluded, Perez Cruz's detention and arrest violated neither the agency's regulations nor the Fourth Amendment. Because law enforcement officers are permitted to "secure the premises both for purposes of their own safety and in order to prevent the destruction of evidence" during the execution of a warrant, the BIA reasoned, the ICE agents did not violate the Fourth Amendment by "ordering employees to stop working, blocking exits, and asking employees to self-identify their immigration or citizenship status." The BIA also concluded that, even if the detention was improper, the evidence introduced by the government was offered to prove

only Perez Cruz's "identity" and therefore could not be suppressed.

On remand from the BIA, the IJ entered a removal order against Perez Cruz. When Perez Cruz again appealed, the BIA affirmed the IJ's order and dismissed the appeal.

Perez Cruz timely petitioned this court for review of the BIA's decisions. He argues, among other things, that his detention violated both the Fourth Amendment and controlling regulations, and that the evidence against him should therefore have been suppressed.

## II

We first briefly address the government's contention that even if Perez Cruz were otherwise entitled to suppression of the evidence obtained as a result of the MSE mass detention and arrest, the critical evidence in question—Perez Cruz's statements as represented in the Form I-213, and his birth certificate—constitutes evidence only of "identity" and so is not subject to suppression. This argument is squarely foreclosed by precedent interpreting the reach of *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984).

*Lopez-Mendoza* determined that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." *Id.* at 1039. On that basis, *Lopez-Mendoza* concluded that an immigrant who "objected only to the fact that he had been summoned to a deportation hearing following an unlawful arrest" could not raise a Fourth Amendment claim. *Id.* at 1040. We have applied *Lopez-Mendoza* beyond the context of mandatory appearance for trial or hearing, holding that "identity

*evidence* cannot be suppressed." *United States v. Garcia-Beltran*, 443 F.3d 1126, 1133 (9th Cir. 2006) (emphasis added).**[3]**

In Perez Cruz's removal proceedings, the government offered statements Perez Cruz made during the factory interrogation regarding his country of origin. It also offered his birth certificate, obtained as a result of Perez Cruz's statements at the factory about his birthplace. According to the government, the statements and birth certificate are proof only of "identity" and therefore not subject to suppression. That evidence, the government maintains, is sufficient to establish Perez Cruz's removability. In so arguing, the government seeks to expand evidence of one's identity to include evidence used to establish alienage—namely, Perez Cruz's statements regarding his country of origin and his birth certificate.

The government's position is flatly contradicted by *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012 (9th Cir. 2008). *Lopez-Rodriguez* concluded that "evidence of alienage" resulting from an egregious Fourth Amendment violation—

---

**[3]** Our interpretation of *Lopez-Mendoza* has not been universally accepted. The Second, Fourth, Eighth, and Tenth Circuits have held that *Lopez-Mendoza* "merely confirmed the jurisdictional rule that an unlawful arrest has no bearing on the validity of a subsequent proceeding," rather than "creat[ing] an evidentiary rule insulating specific pieces of identity-related evidence from suppression." *Pretzantzin v. Holder*, 736 F.3d 641, 646–47, 646 n.6 (2d Cir. 2013); *see also United States v. Ortiz-Hernandez*, 427 F.3d 567, 581–82 (9th Cir. 2005) (W. Fletcher, J., dissenting). We are bound, however, by our somewhat broader interpretation of *Lopez-Mendoza*, which accords with that of several other circuits. *See United States v. Chagoya-Morales*, 859 F.3d 411, 419 & n.14 (7th Cir. 2017) (collecting cases from this court, as well as the First, Third, Fifth, Sixth, Seventh, and Eleventh Circuits).

namely, the petitioner's statements "acknowledg[ing] that she was a native and citizen of Mexico"—should have been suppressed. *Id.* at 1014–15. In so concluding, *Lopez-Rodriguez* reaffirmed that "the identity of an alien in removal proceedings is 'never itself suppressible as a fruit of an unlawful arrest.'" *Id.* at 1015 n.5 (quoting *Lopez-Mendoza*, 468 U.S. at 1039). But, *Lopez-Rodriguez* held, "evidence . . . pertaining to alienage" is subject to suppression. *Id.* However broadly "identity" evidence reaches, *Lopez-Rodriguez* expressly instructs that it does not include evidence "pertaining to alienage." *Id.*

*Lopez-Rodriguez*'s conclusion is bolstered by the Supreme Court's reasoning in *Lopez-Mendoza* itself. *Lopez-Mendoza* was careful to distinguish between identity and alienage, recognizing that, "[s]ince the person and identity of the respondent are not themselves suppressible, the [government] must prove only alienage." 468 U.S. at 1043. If alienage were bound up in identity, as the government presently contends, then *Lopez-Mendoza* would have had no need to make this point.

Here, as in *Lopez-Rodriguez*, the government relied on alienage evidence alleged to be the fruit of unlawful government conduct. *See* 536 F.3d at 1015. The I-213 form notes, for example, that Perez Cruz "was born in Puebla, Mexico on 9/6/1985." Perez Cruz's birth certificate, too, was obtained based on his statement that he was born in Puebla, Mexico. The ICE agent who obtained the birth certificate in Mexico stated in his declaration that he was assigned to obtain a birth certificate "for Gregorio Perez, also known as Gregorio Perez Cruz, who was born on September 6, 1985, in the State of Puebla Mexico."

If Perez Cruz can demonstrate that his statements regarding his birthplace, and his birth certificate derived

from those statements, were the fruit of impermissible government action, they are suppressible as evidence of alienage, not identity. *See id.* at 1015 n.5. We therefore reject the government's argument that the evidence sufficient to prove Perez Cruz's removability is not suppressible.

## III

We turn to the merits of Perez Cruz's illegal detention and interrogation claim.

As a general matter, the Fourth Amendment's exclusionary rule does not apply to immigration proceedings. *See Lopez-Mendoza*, 468 U.S. at 1050–51. There are, however, two longstanding exceptions: (1) "when the agency violates a regulation promulgated for the benefit of petitioners and that violation prejudices the petitioner's protected interests" and (2) "when the agency egregiously violates a petitioner's Fourth Amendment rights." *Sanchez v. Sessions*, 904 F.3d 643, 649 (9th Cir. 2018); *see also Adamson v. Comm'r*, 745 F.2d 541, 546 (9th Cir. 1984) (egregious Fourth Amendment violations); *United States v. Calderon-Medina*, 591 F.2d 529, 531–32 (9th Cir. 1979) (regulatory violations). Perez Cruz argues that suppression of the evidence in his removal proceedings is warranted because his detention constituted either a violation of an ICE regulation or an egregious violation of the Fourth Amendment.

## A

First, did Perez's detention violate any regulation or the Fourth Amendment? At this juncture, it does not matter whether Perez Cruz's detention is considered under the regulation or under the Fourth Amendment, because the

regulatory standards are at least as stringent as those imposed by the Fourth Amendment.

Perez Cruz relies primarily on 8 C.F.R. § 287.8(b)(2), which provides as follows:

> If the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States, the immigration officer may briefly detain the person for questioning.

8 C.F.R. § 287.8(b)(2). Recently, this court recognized that § 287.8(b)(2) "serves a 'purpose of benefit to the alien'" and that evidence gathered in violation of § 287.8(b)(2) may therefore be suppressed where "the violation 'prejudiced interests of the alien which were protected.'" *Sanchez*, 904 F.3d at 650 (quoting *Garcia-Flores*, 17 I. & N. Dec. at 328).

As *Sanchez* explained, § 287.8(b)(2) "was intended to reflect constitutional restrictions on the ability of immigration officials to interrogate and detain persons in this country," thereby providing at least as much protection as the Fourth Amendment. *Id.* at 651.[4] Although § 287.8(b)(2) does not expressly allow for exceptions to its requirements, both parties assume that a so-called *Summers* detention

---

[4] If anything, the regulation is stricter than the Fourth Amendment. On its face, the regulation requires reasonable suspicion in every instance before a person can be detained for questioning by an immigration officer. *See* 8 C.F.R. § 287.8(b)(2). So understood, the regulation might not permit exceptions to the reasonable suspicion requirement.

would be permitted under the regulation. We may likewise assume that *Summers* applies to detentions conducted under § 287.8(b)(2), as we conclude that, even under *Summers*, the detention and interrogation were not permitted.

The government does not dispute that Perez Cruz was seized for purposes of the Fourth Amendment when he was detained in his workplace, frisked, and handcuffed, or that the ICE agents did so without individualized reasonable suspicion. Rightly so. The record confirms that the agents detained Perez Cruz and his coworkers at the outset of the raid, blocking all exits and prohibiting them from leaving. That ICE suspected MSE was employing undocumented workers did not provide reasonable suspicion that Perez Cruz himself was undocumented. It is a fundamental tenet of Fourth Amendment law that "a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). Stated differently, "a person's mere propinquity to others independently suspected of [unlawful] activity does not, without more, give rise to probable cause to search [or seize] that person." *Id.*

"Reasonable suspicion" is no different. "[T]he [*Terry v. Ohio*, 392 U.S. 1 (1968)] exception," for example, "does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized . . . search is taking place." *Id.* at 94.

The government maintains that, despite this bedrock principle, *Michigan v. Summers* permitted the agents to detain Perez Cruz without suspicion on their arrival at the MSE factory to execute the search warrant they had in hand. *See* 452 U.S. at 705. As a result, the government argues, the agents did not violate the Fourth Amendment or

§ 287.8(b)(2). The BIA agreed and consequently refused to suppress the evidence of Perez Cruz's alienage.

The parties do not dispute that the underlying search warrant in this case is of a type that would support a *Summers* detention. *Cf. Alexander v. City & County of San Francisco*, 29 F.3d 1355, 1363 (9th Cir. 1994), *abrogated on other grounds by County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017).**[5]** We shall so assume. Our inquiry, then, turns on whether Perez Cruz's seizure was justified as a valid *Summers* detention. It was not.

## B

### 1

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[T]he general rule," confirmed by "centuries of precedent," is "that Fourth Amendment seizures are 'reasonable' only if based on probable cause." *Dunaway v. New York*, 442 U.S. 200, 213–14 (1979).

Conversely, if a seizure *is* supported by probable cause, "[t]hat action [is] reasonable '*whatever* the subjective intent' motivating the relevant officials." *Ashcroft v. al-Kidd*,

---

**[5]** *Alexander* held that officers were not entitled to rely on *Summers* to detain individuals during the execution of an "administrative inspection warrant," reasoning that "[m]any of [*Summers*'s justifications] simply do not hold true when the underlying warrant is an administrative warrant rather than a criminal search warrant." 29 F.3d at 1363. Similarly, *Sharp v. County of Orange*, 871 F.3d 901 (9th Cir. 2017), held that *Summers* does not provide "the categorical authority to detain co-occupants of a home incident to the in-home execution of an arrest warrant." *Id.* at 915 (emphasis omitted).

563 U.S. 731, 736 (2011) (quoting *Whren v. United States*, 517 U.S. 806, 814 (1996)). In other words, "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 517 U.S. at 813. But—and this point is the critical one for present purposes—"purpose *is* often relevant when suspicionless intrusions pursuant to a general scheme are at issue." *City of Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000) (emphasis added). In those circumstances, unlike where probable cause or reasonable suspicion exists, "'actual motivations' *do* matter.'" *al-Kidd*, 563 U.S. at 736 (emphasis added) (quoting *United States v. Knights*, 534 U.S. 112, 122 (2001)); *see also Whren*, 517 U.S. at 811.

Consider, for example, the inventory search exception, under which police may conduct a warrantless search of an impounded vehicle in accordance with standardized procedures. *See Colorado v. Bertine*, 479 U.S. 367, 371 (1987). The Supreme Court has emphasized that "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990). Thus, such searches are permissible only if "there [is] no showing that the police . . . acted in bad faith or for the sole purpose of investigation." *Bertine*, 479 U.S. at 372; *see also United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012).

A similar principle applies to the exception for administrative searches, which are permitted "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)); *see also* Eve Brensike Primus, *Disentangling Administrative Searches*, 111 Colum. L. Rev. 254, 276 (2011).

Administrative searches of public school students, *see New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985), or of probationers, *see Knights*, 534 U.S. at 121, may be supported by less than probable cause. And no suspicion at all is required for enforcement of certain regulatory schemes, such as routine inspections of residences for housing code violations, *see Camara v. Mun. Court*, 387 U.S. 523, 538 (1967), or of businesses in a closely regulated industry, *see New York v. Burger*, 482 U.S. 691, 708 (1987). Such searches do not violate the Fourth Amendment as long as the government "had proper regulatory purposes for enacting the administrative scheme" and "[t]here is . . . no reason to believe that the instant inspection was actually a 'pretext' for obtaining evidence of . . . violation of the penal laws." *Id.* at 716 n.27; *see also Edmond*, 531 U.S. at 41.

Under these no-probable-cause circumstances, "the exemption from the need for probable cause (and warrant), which is accorded to searches made for the purpose of inventory or administrative regulation, is not accorded to searches that are *not* made for those purposes." *Whren*, 517 U.S. at 811–12. Without an inquiry into purpose, these exceptions would provide officers with "a purposeful and general means of discovering evidence of crime," which the Fourth Amendment forbids. *Wells*, 495 U.S. at 4 (quoting *Bertine*, 479 U.S. at 376 (Blackmun, J., concurring)).

A focus on purpose where there is no probable cause or reasonable suspicion for the search or seizure effectuates the original meaning of the Fourth Amendment. "It is familiar history that indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment." *Payton v. New York*, 445 U.S. 573, 583 (1980). "[T]he Amendment's ban on too-loose warrants

served to reaffirm the common law's general resistance to conferring discretionary authority on ordinary officers." Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 724 (1999); *see also* Laura K. Donohue, *The Original Fourth Amendment*, 83 U. Chi. L. Rev. 1181, 1323–24 (2016). The uncabined discretion potentially provided by these Fourth Amendment exceptions is not unlike the authority provided by the general warrants abhorred by the Framers. *See* Davies, *supra*, at 736–38. A limit on the permissible purposes for which these exceptions may be used limits the exceptions to the circumstances that generated them and so furthers the original understanding of the Amendment.

## 2

The authority provided by *Summers* for detention during the execution of a valid search warrant applies in the absence of probable cause or reasonable suspicion as to the detained individuals' culpability, and so is analogous to the probable cause exceptions for which valid purpose is a prerequisite.

In *Summers*, police officers detained George Summers as he left a house at which the officers were preparing to execute a search warrant. 452 U.S. at 693. The officers learned during the search that Summers owned the house. *Id.* Drugs were found in the basement. *Id.* The officers then searched Summers and found an envelope containing heroin in his coat pocket. *Id.* Summers was charged with possession of that heroin. *Id.* at 694.

Summers moved to suppress the heroin as a fruit of his initial detention, for which, he argued, the officers had no probable cause. *Id.* at 694. Assuming that the detention "was unsupported by probable cause," *id.* at 696, the Supreme Court nonetheless upheld it on the ground that "a warrant to

search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted," *id.* at 705 (footnote omitted). *Summers* thereby created another limited exception to the Fourth Amendment's general requirement that a seizure be supported by probable cause or, under some circumstances, reasonable suspicion. *See Dunaway*, 442 U.S. at 213.

The *Summers* exception was reaffirmed in *Muehler v. Mena*, 544 U.S. 93 (2005). There, police officers investigating a gang-related shooting obtained a search warrant for a suspected gang member's residence. *Id.* at 95–96. During the search the officers handcuffed and detained Iris Mena, who lived at the residence, and questioned her about her immigration status. *Id.* at 96. Mena sued the officers under 42 U.S.C. § 1983, arguing that the officers "should have released Mena as soon as it became clear that she posed no immediate threat" and that, as they had not done so, her detention violated the Fourth Amendment. *Id.* at 96–97. The Court rejected that contention, emphasizing that "[a]n officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" *Id.* at 98 (quoting *Summers*, 452 U.S. at 705 n.19). "[B]ecause a warrant existed to search [the house] and Mena was an occupant of that address at the time of the search," the Court concluded, "Mena's detention for the duration of the search was reasonable under *Summers*." *Id.*

*Summers* and *Mena* both involved searches and detentions limited in scope. But this court has applied the *Summers* exception to cover somewhat broader searches and detentions. *Dawson v. City of Seattle*, 435 F.3d 1054 (9th

Cir. 2006), for example, upheld the detention of the residents of two boarding houses while a search warrant was executed for evidence of rodent infestation and various municipal health code violations. *Id.* at 1066. Likewise, *Ganwich v. Knapp*, 319 F.3d 1115 (9th Cir. 2003), upheld the initial detention of several employees in a waiting room at a workplace being searched, concluding that "the officers' holding the [employees] in the waiting room was precisely the conduct the Supreme Court deemed reasonable in *Michigan v. Summers*." *Id.* at 1120–21 (citation omitted).**[6]** These cases hold that, as a general matter, "the police may detain a building's occupants while officers execute a search warrant as long as the detention is reasonable." *Dawson*, 435 F.3d at 1065. "[T]he duration of a detention may be coextensive with the period of a search, and require[s] no further justification." *Id.* at 1066.

There is one critical—indeed, determinative—difference between those cases and this one. Perez Cruz has presented substantial, uncontroverted evidence that the search authorized by the warrant was far from the ICE agents' central concern. Instead, the agents' principal goal was to detain, interrogate, and arrest a large number of individuals who worked at the MSE factory, hoping to initiate removal proceedings against them. According to the FOIA-obtained documents, that was the "target" of the agents' activity, and the agents came on the premises "in order to" arrest undocumented workers. Notwithstanding this transparent evidence concerning the purpose for entering the MSE

---

**[6]** *Ganwich* ultimately held that the employees' detention was unlawful, as "[t]he officers' conduct was more intrusive than necessary to effectuate an investigative detention otherwise authorized by *Summers*, so it was not reasonable under the Fourth Amendment." 319 F.3d at 1124.

factory, the government asks us to authorize Perez Cruz's detention under *Summers*. We cannot do so.

As the Supreme Court has explained, "*Summers* recognized that a rule permitting the detention of occupants on the premises during the execution of a search warrant, even absent individualized suspicion, was reasonable and necessary in light of the law enforcement interests in conducting a safe and efficient search." *Bailey v. United States*, 568 U.S. 186, 200 (2013). In permitting such detentions, "this exception grants substantial authority to police officers to detain outside of the traditional rules of the Fourth Amendment." *Id.* Where "a safe and efficient search" is not the primary purpose of the officers' actions, *Summers*'s justification for bypassing the Fourth Amendment's traditional protections disappears, *id.*, just as the justifications for doing so disappear—and so bypass of the usual Fourth Amendment requisites becomes impermissible—in inventory and administrative search cases.

We recognize that *Summers* detentions do presuppose a valid search warrant supported by probable cause. But search warrants based on probable cause cover the place being searched, not the seizure of individuals. *Summers* requires no reasonable suspicion for an individual's detention, nor need the magistrate who issues the warrant be told about, or approve, any detention of individuals, planned or otherwise. Again, under *Summers*, "[a]n officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" *Mena*, 544 U.S. at 98 (quoting *Summers*, 452 U.S. at 705 n.19). There is no meaningful difference between the categorical authority to detain without reasonable suspicion

during the execution of a search warrant and the "suspicionless intrusions pursuant to a general scheme" for which the Supreme Court has held purpose *is* relevant. *Edmond*, 531 U.S. at 47.

The law enforcement interests underlying *Summers* are fully consistent with this conclusion. "In *Summers*, the Court recognized three important law enforcement interests that, taken together, justify the detention of an occupant who is on the premises during the execution of a search warrant: officer safety, facilitating the completion of the search, and preventing flight." *Bailey*, 568 U.S. at 194; *see also Summers*, 452 U.S. at 702–03. These interests are parallel to those underlying the Fourth Amendment limitations applicable to suspicionless searches discussed above. Inventory searches, for example, are justified by "three distinct needs: the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger." *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976) (citations omitted). Yet the Supreme Court has long recognized that an inventory search is impermissible if "the police . . . acted in bad faith or for the sole purpose of investigation." *Bertine*, 479 U.S. at 372. "That *Summers* detentions aid police in uncovering evidence and nabbing criminals does not distinguish them from the mine run of seizures unsupported by probable cause, which the Fourth Amendment generally proscribes." *Bailey*, 568 U.S. at 206 (Scalia, J., concurring).

In light of the interests underlying the *Summers* exception, the Supreme Court's reasoning in *Bailey* strongly supports the conclusion that *Summers* does not authorize Perez Cruz's detention. *Bailey* held that officers may not rely on *Summers* to detain individuals who are found beyond "the

immediate vicinity of a premises to be searched." *Id.* at 201 (majority opinion). "Limiting the rule in *Summers* to the area in which an occupant poses a real threat to the safe and efficient execution of a search warrant," *Bailey* reasoned, "ensures that the scope of the detention incident to a search is *confined to its underlying justification*." *Id.* (emphasis added). The Court explained that, "[o]nce an occupant is beyond the immediate vicinity of the premises to be searched, the search-related law enforcement interests are diminished and the intrusiveness of the detention is more severe." *Id. Bailey* instructs that *Summers* does not approve a detention without any individualized suspicion where the officers' primary purpose is *not* conducting "a safe and efficient search" pursuant to a warrant. *Id.* at 200. On the evidence before us, that was precisely the case here—the agents' focus was *not* on conducting a safe search but on engaging in a preplanned investigation and detention of a large number of individuals present at the premises where the search was authorized.

Notably, in establishing the *Summers* exception, the Supreme Court emphasized that "the type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention." 452 U.S. at 701. That assertion held true for the limited searches considered in *Summers* and *Mena*. But as the permissible applications of *Summers* have expanded—covering broader searches and a greater number of detentions, *see, e.g.*, *Dawson*, 435 F.3d at 1066; *Ganwich*, 319 F.3d at 1120–21—so has the potential for abuse.

As "[a]n exception to the Fourth Amendment rule prohibiting detention absent probable cause," the authority

granted by *Summers* "must not diverge from its purpose and rationale." *Bailey*, 568 U.S. at 194. We hold that *Summers*' categorical authority to detain incident to the execution of a search warrant does not extend to a preexisting plan whose central purpose is to detain, interrogate, and arrest a large number of individuals without individualized reasonable suspicion.

**3**

That the ICE agents here had some investigatory purpose in detaining Perez Cruz does not, on its own, invalidate their reliance on *Summers*. In applying the purposive limitation on administrative searches, we have "emphasize[d] that the presence of a criminal investigatory motive, by itself, does not render an administrative stop pretextual." *United States v. Orozco*, 858 F.3d 1204, 1213 (9th Cir. 2017). "[A]n individual suspected of crime may be subjected to facially valid, broadly applicable search schemes on the same basis as other individuals—provided those schemes do, in fact, apply in his case." *United States v. Tsai*, 282 F.3d 690, 695 (9th Cir. 2002). Thus, in the administrative search context, to determine whether the search is invalid because of an impermissible purpose, "we ask whether the officer *would* have made the stop in the absence of the invalid purpose." *Orozco*, 858 F.3d at 1213 (quoting *United States. v. Maestas*, 2 F.3d 1485, 1489 (10th Cir. 1993)). To meet this standard, "a defendant must show that the stop would not have occurred in the absence of an impermissible reason." *Id.*

Perez Cruz has satisfied the *Orozco* burden. As the ICE planning documents unmistakably show, the agents' plans here were centered on detaining and interrogating any and all workers located at the MSE factory to determine whether they were undocumented. One document, for example, stated that ICE was "*targeting* 150–200 undocumented

workers" (emphasis added) during the operation, evidencing that arresting those workers, and not obtaining the documents mentioned in the warrant, was the focus of the operation. In fact, under "significant details" of the operation listed in that document, the search itself not mentioned at all—only the "targeted" workers, the "ratio of apprehensions" of men and women, and the office that ICE would be using "to detain and process all arrested individuals." Another memorandum issued before the raid explained: "ICE anticipates executing a federal criminal search warrant at MSE *in order to* administratively arrest as many as 100 unauthorized workers believed to be from Mexico and Central America" (emphasis added). Those statements alone establish that the central purpose of the raid was not to find documents but to arrest undocumented workers.

Documents prepared after the raid reinforce the conclusion that the agents were focused on the detentions, not the search. Those post-raid memoranda don't mention the search at all; instead they discuss—in great detail—the workers' detention. And another of those documents confirmed that the operation "*targeted* approximately 150 undocumented workers believed to be employed at [MSE]." (emphasis added).

The ICE agents' conduct at the MSE factory and afterward also confirms that they understood the search for records to be of much less significance—if any—as compared to the detentions, interrogations, and arrests of workers. The record suggests that many more agents were dedicated to seizing the MSE workers than to searching for documents. Instead of participating in the document search, those agents present spent time corralling the workers, separating them by gender, handcuffing them, interrogating

them, and searching them. Transportation and detention facilities for a large number of anticipated detainees were readied in advance, confirming that the agents had made careful plans to arrest these workers and take them offsite, rather than merely to detain them during the records search.

The agents' repeated interrogations of Perez Cruz and his coworkers during their detention also demonstrate that the agents' reliance on the *Summers* exception was misplaced. *Mena* authorizes officers to ask questions of *Summers* detainees as long as the detention is not "prolonged by the questioning." 544 U.S. at 100–01. But that authorization does not allow officers to conduct a *Summers* detention *for the purpose* of obtaining answers from detainees, let alone transporting detainees offsite and holding them long beyond the length of the search so they can be further interrogated, as occurred here. *Mena* did not abrogate the longstanding requirement that "if the person[] refuses to answer and the police take additional steps . . . to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure." *INS v. Delgado*, 466 U.S. 210, 216–17 (1984).[7]

The IJ found that the agents "ordered" Perez Cruz and the other male workers to address whether they had work authorization by joining one of two lines. The agents then repeatedly questioned the workers who did not join the work authorization line until responses were provided. Perez Cruz, in particular, declined to answer the initial question, as he

---

[7] We have similarly recognized that "law enforcement may not *require* a person to furnish identification, if not reasonably suspected of any criminal conduct." *United States v. Landeros*, 913 F.3d 862, 870 (9th Cir. 2019) (emphasis added); *cf. Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 187–88 (2004).

joined neither line. He was nonetheless detained and subjected to repeated questioning while detained. The nature of the agents' questioning here indicates that they conducted the detentions *for the purpose* of engaging in mandatory interrogations. *Mena* does not authorize purposely targeted, mandatory interrogations after an individual declines to respond, as opposed to questioning incidental to the warrant execution purpose on which valid *Summers* detentions may be based.[8]

Notably, in contrast to the details regarding detentions, there is no information in the record about the search itself. It is therefore impossible to determine whether the agents even searched for the records purportedly sought, how long the search—if any—took, or whether the records search—if any—occurred anywhere near where the detentions took place.[9] This dearth of detail further reinforces the suggestion

---

[8] Again, two buses and vans arrived at the factory to detain the workers. Perez Cruz was detained, interrogated, and arrested at the factory. He was later transferred to a detention facility where he was questioned during the day and later that night. The next day, the questioning continued. He was ultimately released at 1:00 a.m. of the second night detained.

[9] Even if some initial detention during a search for documents could have been justified under *Summers*, Perez Cruz's detention likely exceeded anything that could be considered proper in scope, because the ICE agents appear to have departed even from the warrant itself. As we have already noted, the search warrant here authorized a search only for the employer's records—presumably, paper documents or electronic files. Yet, the agents used the warrant's authority to enter the working area and detain hundreds of workers. Why a search for records required going onto the floor of a large printer-cartridge factory is unclear. The record also suggests that the agents spent most of their time detaining and interrogating the workers rather than diligently executing the search warrant. *See Ganwich*, 319 F.3d at 1124 ("[H]ere the officers did precisely what the *Summers* Court warned was improper: the officers

that the search was of secondary concern to the agents. Notably, that deficiency is entirely the government's doing, as it expressly declined to offer any evidence to dispute Perez Cruz's version of events.

In sum, Perez Cruz's seizure was not a permissible *Summers* detention. The government suggests no other basis for Perez Cruz's suspicionless detention and mandatory questioning. The agents thus violated 8 C.F.R. § 287.8(b)(2) by detaining and questioning Perez Cruz without "reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States." 8 C.F.R. § 287.8(b)(2).[10]

---

exploited the detention, prolonging it to gain information from the detainees, rather than from the search."); *cf. Rodriguez v. United States*, 135 S. Ct. 1609, 1616 (2015) (noting that the permissible length of a traffic stop is based on a "reasonably diligent" officer).

Ultimately, however, we need not decide whether the ICE agents otherwise exceeded the authority granted by *Summers*, because, given the clear evidence in the record here that the plan was focused on the detention of the workers, not the search for documents, even Perez Cruz's initial detention was not justified.

[10] As we noted above, the standards for § 287.8(b)(2) are at least as stringent as those applicable under the Fourth Amendment, *see supra* Section III.A, so the agents' actions also violated the Fourth Amendment. Because suppression is necessitated by the regulatory violation, we need not reach whether the agents' Fourth Amendment violation was egregious. *Cf. Orhorhaghe v. INS*, 38 F.3d 488, 493 (9th Cir. 1994). For the same reason, we do not address Perez Cruz's argument that his detention and interrogation violated the Fifth Amendment. *See Gonzaga-Ortega v. Holder*, 736 F.3d 795, 804 (9th Cir. 2013).

## C

Ordinarily, for a regulatory violation to warrant suppression, the violation must have prejudiced the petitioner. *See Garcia-Flores*, 17 I. & N. Dec. at 328–29. As *Sanchez* recognized, however, there is no need for Perez Cruz to identify prejudice for a violation of § 287.8(b)(2): "[W]here, as here, 'compliance with the regulation is mandated by the Constitution, prejudice may be presumed.'" 904 F.3d at 652 (quoting *Garcia-Flores*, 17 I. & N. Dec. at 329). We therefore presume that Perez Cruz was prejudiced in his removal proceedings by the ICE agents' decision to detain and question him without individualized reasonable suspicion.[11] Because the agents violated 8 C.F.R. § 287.8(b)(2), Perez Cruz is entitled to suppression of the evidence gathered as a result of that violation. *See id.* at 653.

Finally, Perez Cruz contends that, if suppression is warranted, his removal proceedings should be terminated without prejudice. We agree. This court has recognized that where evidence of alienage is suppressed and "the government did not introduce any other evidence tending to show . . . alienage," termination of the proceedings is warranted. *Lopez-Rodriguez*, 536 F.3d at 1019. Here, the government has not offered any other evidence of Perez Cruz's alienage beyond the Form I-213 and his birth certificate—fruits of the regulatory violation described above. We thus conclude that the removal proceedings

---

[11] Even if prejudice were not presumed, it is quite apparent that the ICE agents' improper detention of Perez Cruz "harmed [his] interests in such a way as to affect potentially the outcome of [his] deportation proceedings," thereby prejudicing him. *Calderon-Medina*, 591 F.2d at 532. As we explain in the text, without the contested evidence, there is no basis in the record for determining Perez Cruz's alienage.

against Perez Cruz should be terminated without prejudice. *See id.*

## IV

The *Summers* line of cases does not justify using the execution of a search warrant for documents to "target" for detention, interrogation, and arrest busloads of people who could not otherwise be detained. The detentions, we conclude, violated an ICE regulation (as well as the Fourth Amendment). In light of that regulatory violation, we grant Perez Cruz's petition for review and remand to the BIA with instructions to dismiss his removal proceedings without prejudice.

**PETITION GRANTED; REVERSED and REMANDED with instructions.**