**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellant*,

v.

FRANZ GREY,
    *Defendant-Appellee.*

No. 18-50328

D.C. No.
2:18 cr 0412-CAS

OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted April 12, 2019
Pasadena, California

Filed May 27, 2020

Before: A. Wallace Tashima and Jay S. Bybee, Circuit
Judges, and M. Douglas Harpool,[*] District Judge.

Opinion by Judge Tashima;
Dissent by Judge Bybee

---

[*] The Honorable M. Douglas Harpool, United States District Judge for
the Western District of Missouri, sitting by designation.

# SUMMARY[**]

## Criminal Law

Affirming the district court's order granting a criminal defendant's motion to suppress evidence seized by Los Angeles County Sheriff's Department deputies, the panel held that where, as here, law enforcement officers are asked to assist in the execution of an administrative warrant authorizing the inspection of a private residence, they violate the Fourth Amendment when their "primary purpose" in executing the warrant is to gather evidence in support of a criminal investigation rather than to assist the inspectors.

Dissenting, Judge Bybee wrote that, given that there was a California Superior Court inspection warrant authorizing sheriff's deputies to accompany the housing inspectors, the deputies would have entered the defendant's house regardless of their subjective motivations, so the correct inquiry is whether, once inside the home, the deputies' actions exceeded the permissible scope of a protective sweep.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Hampton Hunter Bruton (argued), Attorney; United States Department of Justice, Washington, D.C.; Nicola T. Hanna, United States Attorney; L. Ashley Aull, Chief, Criminal Appeals Section; United States Attorney's Office, Los Angeles, California; for Plaintiff-Appellant.

Sonam Henderson (argued), Deputy Federal Public Defender, Office of the Federal Public Defender, Los Angeles, California, for Defendant-Appellee.

**OPINION**

TASHIMA, Circuit Judge:

Following *Alexander v. City & County of San Francisco*, 29 F.3d 1355 (9th Cir. 1994), *abrogated on other grounds by County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017), we hold that where, as here, law enforcement officers are asked to assist in the execution of an administrative warrant authorizing the inspection of a private residence, they violate the Fourth Amendment when their "primary purpose" in executing the warrant is to gather evidence in support of a criminal investigation rather than to assist the inspectors. Accordingly, we affirm the district court's order granting defendant Franz Grey's motion to suppress.

## I. FACTS[1]

### A. City of Lancaster's Code Enforcement Efforts

In October 2017, the City of Lancaster, California, Code Enforcement Division of the Department of Housing and Neighborhood Revitalization, began investigating defendant Grey for possible violations of the City of Lancaster Municipal Code. The investigation primarily focused on complaints from neighbors that Grey's property was "surrounded by tarps," that there was "a camera mounted on a 30-foot pole" and numerous lights on the roof of the house, and that there was "electrical wiring along the fence, which they were concerned meant the fence itself was electrified." The neighbors also suspected that Grey "was conducting an unlawful auto repair business at the property."

In November 2017, City of Lancaster Code Enforcement Officer Sam McNutt viewed Grey's property from the street and confirmed that "tarps surrounded the premises and covered much of the roof" and that "areas of fences/walls exceed the permissible height." McNutt was unable to observe most of the premises because the tarps and other materials obstructed a clear view. McNutt did not determine whether the electrical wiring along the fence was there to electrify the fence or to provide power for another purpose. McNutt also spoke with Grey at some point in November 2017, but was unable to elicit Grey's cooperation in

---

[1] We ordinarily review a district court's factual findings for clear error. Because, however, the government does not challenge the district court's factual findings for purposes of this appeal, we recite the facts as determined by the district court. *See United States v. Grey*, No. CR 18-0412-CAS, 2018 WL 4403979, at *1–7 (C.D.Cal. Sept. 13, 2018).

correcting the alleged code violations. Grey did not respond to McNutt's attempts to contact him after their initial conversation. McNutt also spoke to the property owner, who said she had spoken with her tenant, Grey, and that he had refused to make the corrections that were needed to bring the property into compliance.

In January 2018, McNutt returned to inspect Grey's property from the street. Based on his observations, McNutt issued administrative citations to Grey on February 1 and March 2, 2018. Grey appealed the citations on March 12, 2018, and then made "continuous" phone calls and faxes to the City Clerk's office. Code Enforcement personnel expressed safety-related concerns about returning to the property due to Grey's multiple calls and faxes to the City Clerk's office and the electrical wiring along his fence.

In March 2018, Grey's code enforcement case was referred to Russell Bailey. Bailey is a reserve (part-time) deputy of the Los Angeles County Sheriff's Department ("LASD"). He had served as a deputy with the LASD for 38 years before becoming a managing member of a private consulting firm in 2017. Bailey's consulting firm has contracted with the City of Lancaster "to provide municipal compliance services related to quality-of-life issues" and "to provide general municipal code enforcement services." Bailey stated that his work for the City of Lancaster was not as a law enforcement officer.

On March 15, 2018, Bailey and Mike Kuper, another reserve LASD deputy and contractor, went to Grey's property at the request of the City of Lancaster Public Safety Director, Lee D'Errico. D'Errico told Bailey that the City had received a complaint from Grey's neighbor that Grey had electrified

his fence. Upon arriving at Grey's property, Bailey saw a six-foot-high chain link fence surrounding the premises, tarps attached to the fence that obstructed the view of the property from the public right-of-way, a large canopy-type structure covering the driveway, a long pole extending from the roof of the residence with a video camera and a large light installed on top, and an electrical wire running along the top of the fence. Bailey and Kuper tested the fence and determined that it was not electrified.

During this March 15 inspection, Bailey went to Grey's property and spoke with Grey from outside the fence through a small hole in the tarp. Bailey identified himself and told Grey that he had come to talk about the fence. Grey told Bailey that he had "fortified" his residence because his neighbor had constantly harassed, intimidated, and threatened him, and that before erecting the fence, his neighbor had shot at his dogs with a pellet gun and his car had been vandalized. Grey also stated that the wire along the fence was connected to an audio alarm device inside his house. Bailey told Grey that the height and condition of the fence appeared to be a violation of the Lancaster Municipal Code and would need to be corrected.

During this conversation, Bailey also observed three cars parked in Grey's yard, including on unpaved portions of the premises. Bailey believed that the presence of the cars corroborated the neighbors' complaints that Grey was operating an unlawful auto repair business on the property. After their conversation with Grey, Bailey and Kuper drove to the rear of the property and observed a large tarp that had been installed such that vision into the rear yard was entirely obstructed. Bailey also took photos of the property documenting the fencing, tarps, canopy, and camera.

Based on his conversation with Grey, including Grey's statement about "fortifying" his house, and his observations of Grey's demeanor, Bailey believed that Grey would not agree to abate the conditions on his property and that Grey could pose a threat to City of Lancaster Code Enforcement officers. Bailey asked another LASD deputy about Grey, and that deputy told Bailey that LASD was already aware of Grey and had received several calls about his property, including about firearms being shot into the air.

Bailey then met with D'Errico, Kuper and City of Lancaster Assistant City Attorney Jocelyn Corbett. During that meeting, Bailey learned that Grey's case had been turned over to Bailey by the Code Enforcement team because of a concern for the team's safety. As a result of this conversation, Bailey, Corbett, and D'Errico decided that an inspection was necessary to determine if the property was safe and what further action was needed.

## B.  LASD's Criminal Investigation

On April 4, 2018, one of Grey's neighbors called the Lancaster Community Appreciation Program ("LANCAP") team of the LASD regarding ongoing issues with Grey. LASD Deputy Andrew Chappell contacted the neighbor and the neighbor stated that Grey had shot a Glock handgun into the air several times during the previous year's Fourth of July holiday. The neighbor reported that following the Fourth of July, Grey's behavior became "bizarre" and that Grey had started to do "strange things" like stringing up tarps in his backyard and installing flood lights that illuminated Grey's backyard along with the backyards of his neighbors. The neighbor said he saw multiple pieces of heavy equipment in the backyard of Grey's house, including vehicle parts, firearm

parts, and tools. Then in October 2017, according to the neighbor, Grey showed him a large amount of methamphetamine. Afterwards, Grey invited the neighbor to his house several times and reportedly showed him an "old and beat up" AK-47 rifle, a Glock handgun, a "snub nose" revolver with a blued finish; many firearm parts, including stocks, barrels, and slides to semi-automatic pistols, and firearm ammunition. During one of these visits, Grey allegedly loaded the AK-47 and shot it into the air multiple times from his backyard. The neighbor also reported seeing Grey carrying firearms on his person and keeping firearms in the trunks of the vehicles parked on his property.

The neighbor reported that around December 2017, Grey installed fencing in the front yard, along with a camouflage tarp along the fence, as well as 30-foot poles with cameras affixed to them. The neighbor reported that he was concerned that the fence might be electrified because of an electrical wire attached to the fence. The neighbor also reported that he last saw Grey shoot a gun in his backyard in early March 2018. The neighbor also complained of a burning chemical smell from Grey's property.

When asked why he had waited so long to report the crimes, the neighbor said that he wanted to keep to himself and tried to give Grey the benefit of the doubt, noting the possibility that Grey was mentally ill. However, the neighbor believed that in March 2018, Grey had made a false allegation of child abuse to the Department of Children and Family Services, and that was "the straw that broke the camel's back."

Deputy Chappell then generated a six-pack photographic lineup with Grey's photograph and showed the lineup to the

neighbor, who identified Grey. The neighbor also identified the car driven by Grey and provided Deputy Chappell with photographs he had taken of Grey's front and back yard.

The day after Deputy Chappell's interview with the neighbor, Chappell drove by Grey's house with Deputy Danny Ornelas. As he drove by, he smelled a strong odor of a chemical-like substance coming from the house and observed the fence and tarp described by the neighbor. Deputy Chappell saw Grey in his garage, as well as several vehicles in the driveway and garage.

Deputy Chappell then contacted several other neighbors of Grey, who wished to remain anonymous and "collectively" told Chappell that Grey was "weird," "unhinged," "not all there," and "strange." The neighbors reportedly feared Grey and his "increasingly odd behavior."

Deputy Chappell also contacted Code Enforcement Officer McNutt, who showed Chappell his case file on Grey's house and told Chappell that Grey and his landlord had been generally uncooperative. McNutt told Chappell that Grey had refused to take down the fencing around the front of the property despite three separate City-issued citations.

Deputy Chappell also contacted Deputy Kuper, who told Chappell that he had gone to Grey's property on March 13, 2018, and that Grey had acted very strangely, as if he had a mental illness. Kuper also reported that Grey seemed extremely paranoid and would talk to him only through a crack in the gate at the driveway.

Deputy Chappell then checked Grey's criminal history and determined that Grey had been convicted of felony

driving under the influence in 2008. Chappell also saw that Grey had multiple drug-related arrests and that he had been convicted of felonies in Louisiana and Pennsylvania, including voluntary manslaughter.

Deputy Chappell also reviewed calls for service to Grey's address and saw that there were several calls for service in which deputies had been dispatched to the location regarding loud music being played. On October 25, 2017, deputies were dispatched to Grey's property because another neighbor had reported a gun being fired into the air.

Based on his interview with the neighbor and his subsequent investigation, Deputy Chappell formed the opinion that Grey was a felon in possession of a firearm and ammunition, that he was in the possession of a controlled substance, and that he had negligently discharged firearms multiple times. Deputy Chappell filed a police report dated April 5, 2018, regarding Grey's alleged possession of firearms and ammunition, and the report was approved by Deputy Chappell's supervisor, Sergeant D. Wolanski, on April 6, 2018. During the evidentiary hearing, Wolanski testified that he did not believe the LASD had probable cause to either arrest Grey or search his home at that time.

## C. The Administrative Inspection Warrant

Assistant City Attorney Corbett said that she decided to seek an inspection warrant for Grey's property in late March 2018 because she thought it "was necessary to get behind the tarps and other code-violating obstructions and see if there were additional violations inside the house, particularly with respect to obstructions for first responders." On April 10, 2018, during an event at Lancaster City Hall, Corbett had a

brief discussion with an LASD deputy and D'Errico about Grey's property and Corbett informed them that she was going to obtain a warrant for that property. Also around this time, Deputy Chappell told Sergeant Wolanski that the City was going to apply for an inspection warrant for Grey's property and that the City had asked LASD to help with security at the inspection because of "the way that the property was situated" and "defendant's suspected involvement with guns."

In late April, Corbett helped Bailey draft the warrant affidavit. On May 1, 2018, the City filed an application for an inspection warrant supported by Bailey's affidavit in Los Angeles County Superior Court. In the warrant affidavit, Bailey detailed the City's investigation into Grey's alleged Lancaster Municipal Code violations beginning in October 2017. Based on Bailey's inspection on March 15, 2018, the affidavit asserted the following violations of the Lancaster Municipal Code: (1) maintenance of tarps or similar coverings on, or over, any roof of any structure, except during periods of active rainfall; (2) vehicles parked or stored on unpaved portions of the premises; and (3) fences that exceed the height allowances.

Bailey also stated that due to the obstructions, it was not possible to determine whether the tarps, canopies, and other structures and coverings hindered egress from the residence in the event of a fire or emergency, which would violate the municipal code. Bailey concluded that this would "pose a very serious life safety hazard to the tenant and to emergency responders." Bailey also concluded that the conditions on Grey's premises violated the Lancaster Municipal Code provision that prohibits any condition that constitutes a public

nuisance, blight, or a health or safety hazard to the community or neighboring properties.

Bailey also stated his belief that Grey would not cooperate with any effort to bring his property into compliance with the municipal code and that it may be necessary for the City to undertake abatement actions to eliminate the violations.

In his affidavit, Bailey stated: "In order to ascertain the extent to which unlawful and potentially hazardous conditions are present, and in order to determine the scope of abatement actions that the City may need to undertake, it is necessary for the City to conduct a comprehensive inspection of the premises and residence." Bailey requested an inspection warrant "to authorize [himself] and City and County personnel to enter the premises and to inspect and photograph all yard areas as well as the interior areas of all structures, to assess the extent to which hazardous conditions are present, and to ascertain what abatement actions may be necessary to eliminate such conditions and bring the property into substantial compliance with the Lancaster Municipal Code."

In his affidavit, Bailey also sought: (1) the assistance of LASD Deputies "to ensure that interference with same does not occur"; (2) exemption from the 24-hour advance notice requirement of the issuance of the warrant because of the concern that Grey "may react inappropriately or violently" upon learning of the warrant; (3) authorization to execute the warrant in the absence of Grey, if he is absent; and (4) authorization to forcibly enter yard areas on the premises and the dwelling, if Grey refused access because "it is unknown whether personnel executing the Warrant may be in

jeopardy" as "it cannot be determined whether other persons live in the residence, and in light of Grey's odd behavior and comments it is not known whether he may have undertaken additional 'fortifications' in the yard areas or inside the house."

Later that same day, the Los Angeles County Superior Court found cause to believe that municipal code violations "exist, or may exist," at Grey's property and issued the warrant. The warrant authorized the City to "make an inspection of the interior and exterior areas of all structures" and granted all of the additional requests made in Bailey's affidavit, including the assistance of LASD deputies in the execution of the warrant, waiver of the 24-hour advance notice requirement, and permission to forcibly enter the yard areas and dwelling.

## D. Grey's Arrest and Execution of the Inspection Warrant

After the inspection warrant was obtained, Deputy Chappell was contacted and placed in charge of assisting the City with the inspection warrant because he was the deputy leading the criminal investigation of Grey. Sergeant Wolanski testified that before the execution of the inspection warrant, either Deputy Lopez or Deputy Chappell created an operations plan because they were in charge of the criminal investigation. Wolanski directed the deputies to arrest Grey if they encountered him outside of the home while they were helping with the inspection warrant. Wolanski also intended to interview Grey about the criminal investigation during the execution of the inspection warrant.

On May 3, 2018, City employees and the entire Sherriff's LANCAP team, consisting of nine LASD deputies, went to Grey's house shortly before 10:00 a.m. Wolanski explained that the LANCAP team provides security for City employees in the performance of their duties, and thus they were there that morning "to assist the City of Lancaster personnel with executing an inspection warrant at that location by making sure that the property was safe before inspectors began their work." Among the deputies present were Deputy Chappell, his supervisor, Sergeant Wolanski, and Deputy Armando Lopez. At least two officers, Sergeant Wolanski and Deputy Lopez, were wearing body cameras that day, though the body camera footage shows that they turned their body cameras on and off at various times. At the evidentiary hearing, Corbett testified that it is the City's policy to have at least one LASD deputy accompany an inspection but that she did not know LASD planned to send nine armed deputies nor did she request the presence of that many law enforcement personnel.

### 1. The Arrest

Sergeant Wolanski arrived at the property and waited around the corner while another LANCAP deputy conducted surveillance of the property. Soon after Wolanski arrived, the other deputy saw Grey standing in his driveway. Wolanski "made up a ruse" that the officers needed to inspect his welding equipment and thus they needed Grey to open the gate so they could inspect his equipment. Sergeant Wolanski initially stated in his declaration that when Grey opened the gate, another deputy placed him under arrest for negligent discharge of a firearm and felon in possession of a firearm. At the evidentiary hearing, however, Wolanski testified that by "arrest" he "mistakenly meant detention." There is no body camera footage of this encounter. After handcuffing

Grey, officers placed him in the back of a patrol car. Sergeant Wolanski turned on his body camera and asked Grey to identify himself for the camera. Grey sat handcuffed and shirtless in the back of the patrol car while Wolanski asked him if he had any large sums of cash or valuables in the house, whether he had any weapons inside the house, and whether he had anything in the house that was going to hurt the officers. Grey answered no to all the questions and asked Wolanski why he was searching the house. Wolanski did not answer, shut the door to the car, and turned off his body camera. Deputy Lopez stated in his declaration that he arrived shortly after Grey's arrest.

## 2. The Initial Search of the Inside of Grey's House

Around 10:00 that morning, "before executing the warrant and as part of [their] orders to provide security for the inspection, LASD deputies entered the house to look around and determine whether there were other individuals or any dangerous conditions inside the house that could harm City of Lancaster inspectors when they executed the warrant." Before entering the house, Wolanski turned on his body camera. The deputies drew their weapons and approached the house. Using Grey's keys, they entered the house with their weapons drawn. The body camera captured an officer using a flashlight attached to his gun to search behind and next to the couch in the living room. The body camera turned off as the officers started to move into the other rooms of the house.

Sergeant Wolanski and Deputy Lopez stated that they viewed firearms and ammunition in plain view during their survey of Grey's house. At the evidentiary hearing, Wolanski testified that this "walk-through" took a "[v]ery short time"

– "a couple of minutes," but Lopez stated that it took 15 to 20 minutes to complete. Both Wolanski and Lopez testified that they did not touch any items in the house during this survey. After determining that the house was safe, the officers went outside to await a criminal search warrant to search Grey's residence.

Deputy Lopez drafted the affidavit for the criminal search warrant. In his affidavit, Lopez stated that "while assisting the City of Lancaster with an abatement warrant . . . [he] saw in plain view, multiple handguns (one of which was clearly loaded), rifles, firearm parts, and ammunition while inside." Lopez also stated that he observed drug paraphernalia and a large amount of an off-white crystalline substance resembling methamphetamine in plain view. Lopez added that the controlled substance was "in plain view on the coffee table of the living room," that "ammunition and firearm accessories were seen on multiple tables throughout the location in plain view," and that "multiple firearms were seen on the floor and on a desk inside of one of the bedrooms." Based on these observations and Grey's status as a convicted felon, Lopez sought a search warrant for Grey's house. *Id.*

### 3. Execution of the Inspection Warrant

Bailey and McNutt remained outside and, after the property was secured, they went inside to conduct the code enforcement inspection. At the evidentiary hearing, Bailey testified that this inspection began sometime between 10:00 and 11:00 a.m. The City found numerous public nuisance conditions, including hazardous and non-permitted construction, electrical extensions, and heating equipment, and significant accumulations of junk throughout the premises and inside the residence, which posed a fire hazard

and impeded emergency egress through the house.  Based on these findings, the City issued an administrative order to vacate Grey's property on June 5, 2018.

### 4.  Execution of the Criminal Search Warrant

Based on Lopez's application and supporting affidavit, a Los Angeles County Superior Court judge issued a search warrant for Grey's property that day.  At approximately 2:00 p.m., LASD searched Grey's property and found several firearms, ammunition, and a large amount of currency.

### 5.  LASD's Interview of Grey

At some point after Grey's initial arrest, Grey was transported to the Lancaster Sheriff Station, where a detective read Grey his *Miranda* rights and interviewed him about the devices and powders found inside his home.  Although the record does not specify a time, the detective stated in his report that he was called to the Sheriff Station because LASD deputies located items they believed to be components of a pipe bomb following the service of a search warrant. Sergeant Wolanski and Deputy Lopez also interviewed Grey about his possession of firearms and ammunition.

## II.  PROCEDURAL HISTORY

Grey was charged as a felon in possession of firearms and ammunition, in violation of 18 U.S.C. § 922(g)(1) (Count 1), and with possession of an unregistered firearm, in violation of 21 U.S.C. § 5861(d) (Count 2).

Grey filed a motion to suppress evidence, arguing that LASD's initial search of his home violated his Fourth

Amendment rights because LASD's assistance in the execution of the inspection warrant was a pretext to conduct a criminal search, arrest, and investigation. Because the subsequent search warrant was obtained as a direct result of the initial unlawful search, Grey argued that all evidence seized, and the fruits derived from that search, should be excluded at trial. Following an evidentiary hearing, the district court granted the motion to suppress. *Grey*, 2018 WL 4403979, at *8–12.

Relying on *Alexander*, the district court concluded that LASD's execution of the warrant was unreasonable under the Fourth Amendment because "LASD used the administrative warrant to enter defendant's home without a criminal search warrant for the purpose of gathering evidence for its criminal case." *Id.* at *9. The district court's ultimate finding regarding LASD's purpose rested, in turn, on a number of other factual findings. Specifically, the district court found:

(a) LASD had initiated a criminal investigation of Grey on April 4, 2018, a month before the May 3, 2018 search;

(b) LASD had concluded that Grey was a felon in possession of a firearm and ammunition, that he was in the possession of a controlled substance, and that he had negligently discharged firearms multiple times;

(c) LASD had concluded that it did not have probable cause to arrest Grey or obtain a warrant to search his home;

(d) LASD knew that the City was going to obtain an inspection warrant for Grey's home and to request LASD assistance at the inspection;

(e) LASD took no further action to investigate Grey – or to develop probable cause for a search or arrest – until the inspection warrant was executed;

(f) Deputy Chappell, who led the criminal investigation, was also put in charge of assisting the City with the execution of the inspection warrant;

(g) Sergeant Wolanski intended to interview Grey about the LASD's criminal investigation during the execution of the inspection warrant and instructed LASD deputies to arrest Grey;

(h) although the usual City policy was to have at least one LASD deputy accompany the City during an inspection, LASD sent nine armed deputies to assist with this inspection warrant;

(i) LASD deputies arrested and questioned Grey before initiating the search;

(j) the nine deputies spent 15 to 20 minutes (and perhaps significantly longer) conducting the search[2];

---

[2] As indicated, the LASD deputies made their initial entry into Grey's home at approximately 10:00 a.m. The fact that "timestamps on the photographs LASD took of the inside of defendant's home indicate that the photos were taken at 10:40 a.m., suggest[s]," according to the district court, "that the LASD's initial entry of defendant's home may have lasted even longer than twenty minutes." *Id.*

(k) desk drawers were opened and closed and items were touched and moved inside of the home at some point before the criminal search warrant was executed; and

(*l*) the deputies took photographs of incriminating evidence during their initial search. *See id.*

Because that search was unreasonable, the district court concluded that evidence obtained thereby was inadmissible under the exclusionary rule. *See id.* at \*11. Further, "[b]ecause the evidence gathered by LASD when they initially entered defendant's home served as the basis for the criminal search warrant they obtained later that day, the evidence LASD obtained pursuant to the search warrant is also inadmissible under the exclusionary rule." *Id.*

The government timely noticed this interlocutory appeal of the district court's suppression order.

## III.  STANDARD OF REVIEW

We have jurisdiction under 18 U.S.C. § 3731. "We review *de novo* the district court's ruling on a motion to suppress and for clear error the district court's underlying findings of fact." *United States v. Evans*, 786 F.3d 779, 784 (9th Cir. 2015).

## IV.  DISCUSSION

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Ordinarily, a search or seizure inside a home requires a criminal warrant supported by probable cause. *See*

*Maryland v. Buie*, 494 U.S. 325, 331 (1990) ("[A] search of the house or office is generally not reasonable without a warrant issued on probable cause."); *Payton v. New York*, 445 U.S. 573, 586 (1980) ("It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477 (1971))). Probable cause exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

The warrant and probable cause requirements, however, are subject to exceptions. Under the administrative search exception, "government investigators conducting searches pursuant to a regulatory scheme need not adhere to the usual warrant or probable-cause requirements as long as their searches meet 'reasonable legislative or administrative standards.'" *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (quoting *Camara v. Mun. Court of City & Cty. of S.F.*, 387 U.S. 523, 538 (1967)). As relevant here, "[a] judicial warrant and probable cause are not needed . . . where the search or seizure is in execution of an administrative warrant authorizing . . . an inspection of residential premises to ensure compliance with a housing code." *Ashcroft v. al-Kidd*, 563 U.S. 731, 736–37 (2011) (citing *Camara*, 387 U.S. at 535–38). In such circumstances, an administrative warrant will suffice. *See Camara*, 387 U.S. at 538.

"As with any search, . . . the scope and execution of an administrative inspection must be reasonable in order to be constitutional." *Bruce v. Beary*, 498 F.3d 1232, 1244 (11th Cir. 2007). As the Supreme Court said in *Maryland v. King*, 569 U.S. 435, 448 (2013), "[e]ven if a warrant is not required, a search is not beyond Fourth Amendment scrutiny; for it

must be reasonable in its scope and manner of execution."
Ordinarily, reasonableness under the Fourth Amendment is a
purely objective inquiry. *See al-Kidd*, 563 U.S. at 736; *City
of Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000).
Administrative search and special needs cases, however,
present "[t]wo 'limited exception[s]' to this rule." *al-Kidd*,
563 U.S. at 736 (quoting *United States v. Knights*, 534 U.S.
112, 122 (2001)). In these cases, "'actual motivations' do
matter." *Id.* (quoting *Knights*, 534 U.S. at 122).

• In *Edmond*, 531 U.S. at 44–48, for example, the
Supreme Court held that the City of Indianapolis'
suspicionless vehicle checkpoint program was
unreasonable under the Fourth Amendment because the
program's "primary purpose" was to interdict unlawful
drugs rather than to detect illegal border crossings or
drunk drivers. "Because the primary purpose of the
Indianapolis checkpoint program [wa]s ultimately
indistinguishable from the general interest in crime
control, the checkpoints violate[d] the Fourth
Amendment." *Id.* at 48.

• In *Michigan v. Clifford*, 464 U.S. 287, 294 (1984)
(plurality opinion), the Court, in addressing the Fourth
Amendment requirements applicable when fire inspectors
seek to enter a private residence to investigate a recent
fire, held that an administrative warrant will suffice if the
"primary object" of the search is to determine the cause
and origin of the fire but that a criminal warrant,
supported by probable cause, is required if the "primary
object" of the search is to "gather evidence of criminal
activity." The Court held that "the object of the search
determines the type of warrant required." *Id.*

• In *United States v. Bulacan*, 156 F.3d 963, 973 (9th Cir. 1998) (as amended), we held that "when an administrative search scheme encompasses both a permissible and an impermissible purpose, and when the officer conducting the search has broad discretion in carrying out the search, that search does not meet the Fourth Amendment's reasonableness requirements." Applying this principle, we rejected a search scheme applicable to persons entering a federal building because the scheme's purposes included not only a search for weapons and explosives but also a search for illegal drugs. *See id.* Similarly, in *United States v. $124,570 U.S. Currency*, 873 F.2d 1240, 1245–46 (9th Cir. 1989), we invalidated an airport screening scheme because the purposes of the scheme were to search not only for weapons and explosives but also for drugs and U.S. currency.

• In *Alexander*, 29 F.3d at 1360–61, where, as here, law enforcement officers were called upon to assist in the execution of an administrative warrant providing for an inspection of a private residence, we held that the officers' actions would violate the Fourth Amendment if their "primary purpose" in executing the warrant was to make a criminal arrest rather than assist the inspectors.

• And in *United States v. Orozco*, 858 F.3d 1204 (9th Cir. 2017), where we considered the Fourth Amendment requirements applicable to suspicionless inspections of commercial vehicles, we held that "the presence of a criminal investigatory motive, by itself, does not render an administrative stop pretextual. Nor does a dual motive – one valid, and one impermissible." *Id.* at 1213 (citations omitted). Instead, we held that "a defendant

must show that the stop would not have occurred in the absence of an impermissible reason." *Id.* (quoting *United States v. Maestas*, 2 F.3d 1485, 1489 (10th Cir. 1993)). We have applied this principle not only to suspicionless commercial vehicle inspections but also to inventory searches, *see United States v. Johnson*, 889 F.3d 1120, 1126–28 (9th Cir. 2018); *United States v. Bowhay*, 992 F.2d 229, 231 (9th Cir. 1993), border searches, *see United States v. Tsai*, 282 F.3d 690, 694–96 (9th Cir. 2002), and, most recently, inspections of business records, *see Perez Cruz v. Barr*, 926 F.3d 1128, 1143 (9th Cir. 2019).

In the case before us, the district court applied *Alexander*, holding that LASD's execution of the warrant was unreasonable under the Fourth Amendment because LASD's primary purpose in executing the warrant was to gather evidence in support of its criminal investigation rather than to assist the inspectors. *See Grey*, 2018 WL 4403979, at *9. On appeal, the government argues that the district court should have applied *Orozco* instead, and that LASD's actions were lawful under *Orozco* because LASD's "impermissible motive was not the but-for cause of the search," because "the sweep of Grey's dwelling would have occurred regardless of the deputies' motivation to uncover criminal evidence."

For the reasons that follow, we disagree with the government's contention and sustain the district court's application of *Alexander*.

Initially, we note that there appears to be little practical difference between *Alexander*'s primary purpose test and the *Orozco* test. In *Perez Cruz*, where we most recently applied *Orozco*, we concluded that the *Orozco* test was satisfied

because "the *central purpose* of the raid was not to find documents [covered by the administrative warrant] but to arrest undocumented workers." *Perez Cruz*, 926 F.3d at 1143 (emphasis added). Our conclusion that "Perez Cruz has satisfied the *Orozco* burden" was based on evidence showing that "the agents were *focused on* the detentions, not the search." *Id.* at 1143–44 (emphasis added). It was sufficient that the agents "understood the search for records to be of *much less significance* – if any – as compared to the detentions, interrogations, and arrests of workers" and that "the search was of *secondary concern* to the agents." *Id.* at 1144–45 (emphases added). *Perez Cruz*'s "central purpose" inquiry appears to be materially indistinguishable from *Alexander*'s "primary purpose" test. But even assuming that there is a material difference between the two tests, we hold that the district court properly followed *Alexander*.

First, *Alexander* constitutes controlling circuit precedent and is directly on point. Like the case before us, *Alexander* concerned the situation in which law enforcement officers are called upon to assist in the execution of an administrative warrant providing for the inspection of a private residence.[3]

---

[3] The Dissent attempts to distinguish *Alexander* on the ground that there law enforcement "supplanted" the health inspector's mission after the inspection had started and "escalated" the inspection by "conducting their own operation." If anything, the factual distinctions make this case stronger than *Alexander*. Here, LASD had no need to "escalate" the situation because it controlled it from the outset, starting with Sergeant Wolanski's order to arrest Grey immediately even before the protective sweep. (The Dissent says that "Grey was quickly detained outside, which the deputies has the right to do." But the district court found that what Sergeant Wolanski ordered and what occurred was an *arrest, not* a detention, as Wolanski later characterized his order.) And during the LASD's initial 20+ minute search, it had total control of the premises and the city inspectors were not allowed entry into the premises until after the

*See Alexander*, 29 F.3d at 1357–60. The *Orozco* line of authority, by contrast, addresses circumstances far afield from an administrative search of a private residence, i.e., a home – border searches, inventory searches, and inspections of commercial vehicles and commercial premises.

Second, *Alexander* is grounded in Supreme Court precedent. *Alexander* derived its primary purpose test from the Supreme Court's decision in *Clifford*, which, like this case, concerned administrative searches of private residences. *Clifford* expressly adopted a primary purpose – or "primary object" – test, holding that:

> the object of the search determines the type of warrant required. If the primary object is to determine the cause and origin of a recent fire, an administrative warrant will suffice. . . . If the primary object of the search is to gather evidence of criminal activity, a criminal search warrant may be obtained only on a showing of probable cause to believe that

---

LASD's lengthy search had been completed. (Certainly, it is "appropriate during a protective sweep [that] the City's inspectors did not enter the house." But the Dissent overlooks the prolonged duration – 20 minutes or more – of the LASD's initial entry.) Thus, unlike in *Alexander*, no mid-operation "escalation" by LASD was needed. Contrary to the Dissent's assertion, the LASD "*did* . . . supplant the City's operation prior to entering the house." Dissent at 50.

As even the Dissent recognizes, the LASD's search was more than a "protective sweep," which "is a quick and limited search of premises" that "is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Dissent at 53 (quoting *Buie*, 494 U.S. at 327).

> relevant evidence will be found in the place to
> be searched.

*Clifford*, 464 U.S. at 294. Although *Clifford* was a plurality opinion, we concluded in *Alexander* that "a majority of the Justices subscribed to that part of the *Clifford* opinion on which plaintiff relies." *Alexander*, 29 F.3d at 1360–61 n.4. We therefore treated the plurality opinion as controlling Supreme Court precedent.

Third, even putting *Alexander* and *Clifford* aside, we would hesitate to extend the *Orozco* test – applicable to border searches, inventory searches, and commercial inspections of vehicles and businesses – to an administrative search or seizure involving a private residence. "Whether a search is reasonable 'is determined by assessing, on the one hand, *the degree to which it intrudes upon an individual's privacy* and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Samson v. California*, 547 U.S. 843, 848 (2006) (emphasis added) (quoting *Knights*, 534 U.S. at 118–19). "[T]here can be no ready test for determining reasonableness other than by balancing the need to search *against the invasion which the search entails*." *Camara*, 387 U.S. at 536–37 (emphasis added).

Any determination of reasonableness in the circumstances of this case, therefore, must account for the fact that "privacy interests are especially strong in a private residence." *Clifford*, 464 U.S. at 296. As the Court explained in *Payton*:

> The Fourth Amendment protects the
> individual's privacy in a variety of settings.
> In none is the zone of privacy more clearly

defined than when bounded by the
unambiguous physical dimensions of an
individual's home – a zone that finds its roots
in clear and specific constitutional terms:
"The right of the people to be secure in their
. . . houses . . . shall not be violated." That
language unequivocally establishes the
proposition that "[a]t the very core [of the
Fourth Amendment] stands the right of a man
to retreat into his own home and there be free
from unreasonable governmental intrusion."

445 U.S. at 589–90 (alterations in original) (quoting
*Silverman v. United States*, 365 U.S. 505, 511 (1961)).
Where a private residence is involved, the Supreme Court has
repeatedly emphasized the importance of keeping criminal
investigatory motives from coloring administrative searches
and seizures. In *Camara*, for instance, the Court concluded
that municipal health and safety inspections of private
residences may be conducted with only an administrative
warrant in part because such inspections are not "aimed at the
discovery of evidence of crime" and therefore "involve a
relatively limited invasion of the urban citizen's privacy."
387 U.S. at 537. In *Wyman v. James*, 400 U.S. 309, 322–23
(1971), the Court upheld a program requiring home visits by
caseworkers as a condition for welfare assistance in part
because "[t]he home visit is not a criminal investigation, does
not equate with a criminal investigation, . . . is not in aid of
any criminal proceeding" and "is made by a caseworker . . .
whose primary objective is . . . the welfare, not the
prosecution, of the aid recipient." In *Abel v. United States*,
362 U.S. 217 (1960), the Court upheld the use of an
administrative arrest warrant in a deportation case but
emphasized that its

> view of the matter would be totally different had the evidence established . . . that the administrative warrant was here employed as an instrument of criminal law enforcement to circumvent the latter's legal restrictions, rather than as a bona fide preliminary step in a deportation proceeding.  The test is whether the decision to proceed administratively toward deportation was influenced by, and was carried out for, a purpose of amassing evidence in the prosecution for crime.

*Id.* at 230.  And in *Clifford*, the Court held that a criminal warrant, supported by probable cause, is required "[i]f the primary object of the search is to gather evidence of criminal activity."  *Clifford*, 464 U.S. at 294.  The government's invitation to apply *Orozco* to this context does not adequately account for the heightened privacy interests at stake here.[4]

The government argues, in essence, that the presence of LASD's criminal investigatory motive was harmless because "the sweep of Grey's dwelling would have occurred regardless of the deputies' motivation to uncover criminal evidence."  We disagree.  Under the Fourth Amendment, reasonableness is determined by assessing the degree to which a search or seizure "intrudes upon an individual's

---

[4] To the extent the Supreme Court has intimated that an *Orozco*-type test should apply, it has done so in the context of inventory searches.  *See Colorado v. Bertine*, 479 U.S. 367, 372 (1987) ("In the present case, as in *Opperman* and *Lafayette*, there was no showing that the police, who were following standardized procedures, acted in bad faith or for *the sole purpose* of investigation." (emphasis added)).  By contrast, in *Clifford*, 464 U.S. at 294, where the administrative search involved a private residence, the Court applied a primary purpose test.

privacy." *Samson*, 547 U.S. at 848. Reasonableness therefore accounts not only for the scope of a search or seizure but also the "manner of [its] execution." *King*, 569 U.S. at 448.

To be sure, when an impermissible motive has no effect on the intrusiveness of an administrative search or seizure, the Fourth Amendment is not offended. As we explained in *Bowhay*, "suppression [is] not required when, even assuming [a] questioned motivation is dominant, 'the Fourth Amendment activity undertaken *is precisely the same* as would have occurred had the intent or motivation been entirely absent from the case." 992 F.2d at 231 (emphasis added) (quoting Wayne R. LaFave, *Search and Seizure* § 1.4(e) at 92-3 (2d ed. 1987)). "When the police conduct would have been the same regardless of the officer's subjective state of mind, no purpose is served by attempting to tease out the officer's 'true' motivation." *Id.* In *Bowhay*, the officer conducting an inventory search "had dual bona fide motives: to search for 'narcotics and weapons,' and to compile an inventory of the bag's contents," as required by police department policy. *Id.* Under the circumstances of the case, however, the "allegedly improper motive" had no impact on "the police conduct": "the department's policy was to search everything; the officer had no discretion. Because of this, the presence of an investigative motive d[id] not invalidate the inventory search." *Id.*

When officers *do* have discretion, by contrast, the presence of an improper motive may well have "a significant distorting effect" on the scope of a search or seizure or the manner in which it is executed. *$124,570 U.S. Currency*, 873 F.2d at 1245. In the case at bench, for instance, LASD's criminal investigatory motive plainly increased the intrusion

on Grey's privacy interests. But for LASD's criminal investigatory motive, Grey would not have been arrested before commencement of the search. Nor would nine armed deputies have descended on Grey's home. And the deputies' "protective sweep" would not have lasted 15 to 20 minutes, perhaps longer. In the context of an arrest, the Supreme Court has described a protective sweep as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others," that "is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Buie*, 494 U.S. at 327. The manner in which LASD executed the warrant here was far more intrusive. Accordingly, we cannot agree with the government that, when applied to the *Alexander-Clifford* context, the *Orozco* rule adequately "balanc[es] the need to search against the invasion which the search entails." *Camara*, 387 U.S. at 536–37. Further, in arguing that *Orozco should* apply to these circumstances, the government has offered no principled basis upon which to distinguish *Alexander*. Under our case law, "[i]t is our obligation . . . to reconcile [circuit precedent], if possible, so as to avoid an intracircuit conflict," not to create such conflicts. *See Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065 (9th Cir. 2004). Applying *Alexander* here fulfills this obligation.

For these reasons, we conclude that the district court properly applied *Alexander*'s primary purpose test, rather than *Orozco*, to the LASD conduct at issue in this case. Where, as here, law enforcement officers are called upon to assist in the execution of an administrative warrant providing for the inspection of a private residence, the execution of the warrant is consistent with the Fourth Amendment only so long as the officers' primary purpose in executing the warrant

is to assist in the inspection. If the person challenging the execution of the warrant shows that the officers' primary purpose was to gather evidence in support of an ongoing criminal investigation, the conduct does not satisfy the Fourth Amendment. *See Alexander*, 29 F.3d at 1360–61.

Where the execution of the warrant is *no more intrusive* than it otherwise would have been, however, it makes no sense to invalidate the search and suppress the evidence because of the presence of an improper motive. *See Bowhay*, 992 F2d at 231. Thus, although we hold that the execution of the warrant is presumptively unconstitutional where officers' primary purpose is criminal investigation, the government may rebut this presumption by showing that the improper motive in fact had no impact on the intrusiveness of the search. Where the government can show that the improper motive did not affect the scope of the search or the manner in which a warrant was executed, there would be no Fourth Amendment violation. This approach comports with our longstanding view that, "[t]o meet the test of reasonableness, an administrative . . . search must be as limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it." *Bulacan*, 156 F.3d at 967 (quoting *United States v. Davis*, 482 F.2d 893, 910 (9th Cir. 1973), *overruled on other grounds by United States v. Aukai*, 497 F.3d 955, 960–61 (9th Cir. 2007) (en banc)).

Here, the district court properly applied *Alexander*. Its finding that LASD's primary purpose in executing the warrant was to gather evidence in support of its criminal investigation rather than to assist the City inspectors was not clearly erroneous. *See Grey*, 2018 WL 4403979, at *9. Although the district court did not use the exact words "primary purpose," that finding is the clear import of the

court's decision and is not clearly erroneous. The government does not distinctly challenge that finding as clearly erroneous, but even if it did so we would conclude that there was no clear error. The existence of the ongoing criminal investigation, LASD's inability to establish probable cause for a search or arrest on its own, LASD's failure independently to advance its own investigation pending the administrative inspection, the involvement of the deputies leading the criminal investigation in planning and executing the operation, Grey's arrest and questioning, the number of deputies involved, and the duration and manner of LASD's "protective sweep" all support the district court's finding. That finding was not "illogical, implausible, or without support in the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).

Moreover, in this case, we have the motives of two separate and independent governmental entities at play – the City of Lancaster's Code Enforcement Division, and Los Angeles County's LASD.[5] And the record, as well as the district court's findings, amply support that it was the motives of the LASD that were dominant in the early phases of this search, including Grey's arrest and initial questioning, the

---

[5] The City of Lancaster has no Police Department. Police services, including law enforcement functions, in Lancaster are provided, by contract, by the Los Angeles County Sheriff's Department – the LASD – which operates the Lancaster Station in the City of Lancaster. *See* https://en.wikipedia.org/wiki/Lancaster,_California (last visited 02/15/2020); *see also* https://www.lakewoodcity.org/about/history/lakewoodplan.asp (last visited 02/15/2020). Nothing in the record indicates that any official of the City of Lancaster had any authority over how the LASD carried out its law enforcement functions in the City of Lancaster.

initial entry into Grey's home and the ensuing 20+ minute search.**[6]**

Furthermore, this is not a case in which the government has shown, or could show, that the execution of the warrant was no more intrusive than it would have been absent LASD's criminal investigatory motive. Grey's arrest, the number of deputies involved and the length of the "protective sweep" show that the criminal investigatory motive resulted in a greater intrusion on Grey's privacy interests than would have occurred absent that motive. Arguably, the conduct at issue here more closely resembled a criminal raid than an administrative inspection. *See Bruce*, 498 F.3d at 1244.

Thus, it does not matter whether *the City inspectors'* primary purpose may have been permissible – a question we need not reach. Grey does not challenge the inspectors' decision to obtain the warrant or the search conducted by the inspectors following LASD's initial search or sweep. He instead challenges the County LASD's execution of the warrant. Under *Alexander*, therefore, we focus on LASD's motives. *See Alexander*, 29 F.3d at 1360–61.

Finally, nothing we say here should be construed as questioning the City's entitlement to the assistance of LASD – or another law enforcement agency – in executing the administrative warrant, to ensure the safety of its inspectors and to prevent interference with the inspection. Under the warrant, LASD could take actions reasonably necessary to "assist in the execution of the Warrant to ensure that interference with same does not occur." But "an

---

**[6]** This 20+ minute search by the LASD was made *before* the Lancaster Code Enforcement Division's administrative search.

administrative search may not be converted into an instrument which serves the very different needs of law enforcement officials." *Id.* at 1361. "Because administrative searches are so easily diverted from their narrowly defined purposes, government officials have an affirmative responsibility to keep them from being misused." *Orozco*, 858 F.3d at 1214. LASD could have fulfilled that responsibility here by executing the warrant in a manner consistent with the warrant's administrative purpose rather than using the inspection warrant as an opportunity to further its ongoing criminal investigation.

Because we affirm the district court's suppression order on this ground, we need not address Grey's argument that the warrant itself was invalid under state law. Nor need we address whether LASD exceeded the scope of the warrant by, for example, arresting Grey or opening drawers and moving items during the initial search. *See McCarty*, 648 F.3d at 834 (explaining that a valid administrative warrant does not "provide[] carte blanche to the searching officers to snoop to their hearts' content without regard to the scope of their actions"). We hold only that LASD's execution of the warrant was unreasonable under *Alexander*, and hence that the district court properly granted Grey's motion to suppress evidence.

The district court's order granting Defendant Grey's motion to suppress evidence is

**AFFIRMED.**

BYBEE, Circuit Judge, dissenting:

Franz Grey was a difficult neighbor. Multiple neighbors complained to housing officials in Lancaster, California (the City) about the tarps, floodlights, and electrified fence that Grey had erected to enclose his property. Neighbors complained to the Los Angeles Sheriff's Department (LASD) as well. They were concerned that Grey was shooting an AK-47 and other weapons into the air, that there were strange chemical smells emanating from his property, and that Grey seemed paranoid and unhinged. Deputies learned that Grey had prior felony convictions, including for drug-related crimes and manslaughter. When the City obtained an administrative warrant to inspect his house for code violations, the warrant authorized deputies to accompany the officials to ensure their safety. While conducting a protective sweep of Grey's home, the LASD deputies seized evidence found in plain view. The majority holds that the deputies violated the Fourth Amendment the moment they entered Grey's home because they subjectively intended to gather evidence of criminal activity rather than assist the health inspectors. Maj. Op. at 3. Accordingly, the majority affirms the district court's order suppressing the evidence seized by the LASD deputies.

In my view, that conclusion is contrary to basic Fourth Amendment principles. Given the inspection warrant from a California Superior Court, which authorized LASD to accompany the housing inspectors, the deputies would have entered Grey's house regardless of their subjective motivations. Instead, the correct inquiry is whether, once inside the home, the deputies' actions exceeded the permissible scope of a protective sweep. Because the district court did not address the scope of the search, I would vacate

the suppression order and remand for further proceedings. I respectfully dissent.

I

The Fourth Amendment, made applicable to the states through the Fourteenth Amendment, protects our right "to be secure in [our] persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The question in this case is whether LASD's protective sweep and ensuing inspection of Grey's house was an "unreasonable" search. The Supreme Court has provided the general rule:

> Fourth Amendment reasonableness is predominantly an objective inquiry. We ask whether the circumstances, viewed objectively, justify [the challenged] action. If so, that action was reasonable *whatever* the subjective intent motivating the relevant officials. This approach recognizes that the Fourth Amendment regulates conduct rather than thoughts, and it promotes evenhanded, uniform enforcement of the law.

*Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (alteration in original) (internal quotation marks and citations omitted); *see also City of Indianapolis v. Edmond*, 531 U.S. 32, 45–47 (2000); *Whren v. United States*, 517 U.S. 806, 814 (1996); *Perez Cruz v. Barr*, 926 F.3d 1128, 1138–39 (9th Cir. 2019).

There are, however, "[t]wo 'limited exception[s]' to this rule . . . where 'actual motivations' do matter." *al-Kidd*, 563 U.S. at 736 (second alteration in original) (citation

omitted).  Those exceptions are special-needs searches and administrative searches.  *Id.*  Only the latter exception is relevant here, as that exception applies to "an inspection of residential premises to ensure compliance with a housing code."  *Id.* at 736–37 (citing *Camara v. Mun. Court of City & Cty. of S.F.*, 387 U.S. 523, 535–38 (1967)).

Administrative-search cases fall into one of two categories.  First are those where the administrative scheme results in searches conducted without discretion or suspicion. *See Edmond*, 531 U.S. at 35–36.  Second are those in which the administrative scheme gives individual officers discretion as to who or what to search.  *See United States v. Orozco*, 858 F.3d 1204, 1207–08, 1210 (9th Cir. 2017).

The majority seems to overlook the difference between these two lines of cases, instead suggesting that they all support an inquiry into the subjective motivations of individual officers.  *See* Maj. Op. at 22–24.  Because that is mistaken, I will review these two categories of administrative-search cases before explaining where Grey's case belongs.

A

When a search is conducted pursuant to an administrative scheme that does not grant discretion to the government official, we examine the purposes behind the search "at the programmatic level."  *Edmond*, 531 U.S. at 46.  We do not "probe the minds of individual officers acting at the scene." *Id.* at 48.

The quintessential case applying this principle is *Edmond*. There, the Supreme Court addressed whether a vehicle

checkpoint program intended to discover the possession or transport of drugs violated the Fourth Amendment. *Id.* at 34. Under the program, officers stopped a predetermined number of vehicles; the officers had "no discretion to stop any vehicle out of sequence." *Id.* at 35. As a result, the Supreme Court looked only to the purpose of the checkpoint program itself, and not to the motivations of the individual officers. The Court concluded that, because the "primary purpose" of the program was "to uncover evidence of ordinary criminal wrongdoing," the stops and searches violated the Fourth Amendment. *Id.* at 41–42.

Thus, when the programmatic purpose of an administrative scheme violates the Fourth Amendment, no search conducted pursuant to that scheme is constitutional.[7] But what if the programmatic purpose of an administrative scheme complies with the Fourth Amendment? In that instance, the inquiry shifts. We still do not examine the subjective motivations of the government official. *See United States v. McCarty*, 648 F.3d 820, 833 (9th Cir. 2011) ("[W]here a warrantless search is conducted pursuant to a lawful administrative scheme with a constitutionally

---

[7] On several occasions, we have struck down administrative schemes because their programmatic purposes contravened the Fourth Amendment. *See United States v. Bulacan*, 156 F.3d 963, 973 (9th Cir. 1998) (holding that regulations authorizing federal officers to search an individual's belongings for narcotics upon entry to a federal building violated the Fourth Amendment); *United States v. $124,570 U.S. Currency*, 873 F.2d 1240, 1245–47 (9th Cir. 1989) (holding that an administrative scheme that awarded airport officials $250 if they identified passengers carrying large quantities of cash and reported them to the United States Customs Service violated the Fourth Amendment). But these cases have no relevance here. Grey does not argue that the administrative scheme under which the inspection warrant was issued is facially unconstitutional.

permissible motivation, the subjective motive of the individual conducting the search will not invalidate the search." (internal quotation marks omitted)). Instead, we ask whether "the searcher's actions [were] cabined to the scope of the permissible administrative search." *Id.* at 834–35. Only if the objective actions of the searching official exceed the permissible scope does the official's subjective intent become relevant. *Id.* at 835.

We have applied this analysis on several occasions. In *McCarty*, Transportation Security Administration (TSA) officials searched a traveler's luggage. *Id.* at 824. Under the governing administrative scheme, "TSA screens all luggage," and individual TSA officials "do not have the discretion or ability to stop the [screening] machines." *Id.* In those circumstances, we did not question the propriety of the initial search of the defendant's bag. Instead, we examined the TSA official's actions to determine if they "exceeded the scope of the administrative search." *Id.* at 835. Ultimately, we found that some of the official's actions did "extend the scope of the search beyond what was necessary," so those portions of the search violated the defendant's Fourth Amendment rights. *Id.* at 836.

Our decision in *United States v. Tsai*, 282 F.3d 690 (9th Cir. 2002), is in accord. There, an Immigration and Nationalization Service (INS) agent searched the defendant's valise at the border. *Id.* at 693. Because "the Fourth Amendment requires neither individualized suspicion nor a warrant" for a "routine border search[]," the only question was whether the search's "degree of intrusiveness" exceeded the scope of the "administrative purposes of enforcing the immigration laws." *Id.* at 694 (internal quotation marks omitted). Because the search of the defendant's valise fell

well within the permissible scope, the search was constitutional even though the INS agents who searched the bag were subjectively motivated by an "investigative purpose." *Id.* at 696.

Finally, in *United States v. Bowhay*, 992 F.2d 229 (9th Cir. 1993), we considered an inventory search of the defendant's bag following his arrest. The police department's "standard procedure" was that "everything [be] inventoried." *Id.* at 230. Because "the officer had no discretion," his admission that he searched the defendant's bag based partly on a motive to investigate rather than merely inventory was irrelevant. *Id.* at 231. We noted that "[w]hen the police conduct would have been the same regardless of the officer's subjective state of mind, no purpose is served by attempting to tease out the officer's 'true' motivation." *Id.* Thus, we held that the search of the defendant's bag did not violate the Fourth Amendment. *Id.*

The common theme running through these cases is that, when an administrative scheme results in suspicionless or discretionless searches, the subjective motivations of the searching officers are irrelevant. Instead, the proper inquiry is whether the officers' actions exceeded the scope of the administrative scheme. If they did, the search is likely unconstitutional. If they did not, the search is constitutional, regardless of what the officers may have intended when conducting the search.

The only case I am aware of appearing to depart from these principles is *United States v. Johnson*, 889 F.3d 1120 (9th Cir. 2018) (per curiam). There, Portland police officers conducted an inventory search of the defendant's vehicle and belongings following his arrest. *Id.* at 1123. The police

department's policy required officers to conduct this inventory search and authorized them "to seize the items found for safekeeping." *Id.* at 1127. Despite the officers' lack of discretion, we analyzed the subjective motivations of the officers. We held that the search violated the Fourth Amendment "because the officers themselves *explicitly admitted* that they seized items from the car in an effort to search for evidence of criminal activity." *Id.* We also noted that the officers did not seize everything in the car, but only those items that appeared to be relevant to the defendant's suspected criminal activity, which was inconsistent with the purpose of the department's policy that a defendant's belongings be taken for safekeeping. *See id.* at 1128 & n.1. In short, we concluded that the search "would not have occurred" but for the officers' criminal-investigatory motive. *Id.* at 1128.

Frankly, *Johnson* is difficult to reconcile with our prior case law. Indeed, despite dealing with nearly identical facts, *Johnson* neither cited nor discussed our previous decision in *Bowhay*. Because the Portland officers had no discretion to choose whether to perform the inventory search, the subjective motivations of the officers should have been irrelevant. The only inquiry ought to have been whether the officers exceeded the scope of the inventory-search justification. I can only explain *Johnson*'s result by the officers' unabashed admission that the police department's inventory-search policy was merely pretext for the officers' other motivations. Accordingly, I read *Johnson* to establish that even a discretionless search within the scope of the governing administrative scheme can violate the Fourth Amendment when the searching official admits that the search was motivated solely by reasons unrelated to the administrative justification. If that circumstance is not

present, the analytical approach reflected in *McCarty*, *Tsai*, and *Bowhay* applies, and subjective motivations are irrelevant.

B

When an officer conducts a search under an administrative scheme that grants the officer discretion as to who or what to search, we examine the "actual motivations" of the officer to determine whether the administrative justification for the search was merely a "pretext" masking an "impermissible reason" for the search. *Orozco*, 858 F.3d at 1210, 1213 (internal quotation marks omitted). The search is unconstitutional only if it "would not have occurred in the absence of an impermissible reason." *Id.* at 1213 (internal quotation marks omitted). In other words, a search warrant is required if the "primary object of the search is to gather evidence of criminal activity." *Michigan v. Clifford*, 464 U.S. 287, 294 (1984); *see also Perez Cruz*, 926 F.3d at 1141 (noting that the Fourth Amendment is violated if the "primary purpose" of the search is unrelated to the justifications for the governing administrative scheme). But if the searching officer had dual motives—"one valid, and one impermissible"—the search is constitutional. *Orozco*, 858 F.3d at 1213; *see also* 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE 902 (5th ed. 2012) (noting that "pretext arises out of the fact that the evidence is found in a search which would not have occurred at all").

*Orozco* is our clearest example of this analysis. There, we analyzed whether a stop and search made under Nevada's Commercial Vehicle Safety Plan was pretextual when Nevada highway patrol troopers stopped and searched Orozco's truck after receiving a tip that it was carrying illegal

drugs. 858 F.3d at 1207–08. Under Nevada's administrative scheme, officers could stop commercial vehicles "[t]o enforce the provisions of laws and regulations relating to motor carriers, the safety of their vehicles and equipment, and their transportation of hazardous materials and other cargo." Nev. Rev. Stat. § 480.360(4). The scheme did not, however, allow stops and searches for "criminal investigatory purposes, such as drug interdiction, for which reasonable suspicion or probable cause is lacking." *Orozco*, 858 F.3d at 1206. We held that, to prove that the stop and search was unreasonable, Orozco had to "come forward with objective evidence to suggest that the intrusion was not made for the purpose of enforcing the administrative inspection scheme." *Id.* at 1213. In other words, the defendant had to show that "*but for* the officers' belief that [the defendant] might be carrying drugs, the stop never would have happened." *Id.* at 1210 (emphasis added). Ultimately, we concluded that "the only purpose of the stop" of Orozco "was to investigate criminal activity" and "[t]here was no secondary administrative purpose at all—only a charade to camouflage the real purpose for the stop." *Id.* at 1216; *see id.* at 1213 ("[T]he manner in which the stop itself was conducted strongly suggests that it was *wholly* pretextual." (emphasis added)); *id.* at 1214 (referring to "the Assistant U.S. Attorney's oral concession that, but for the tip, the officers would not have stopped the defendant's truck"). Accordingly, we held that the stop violated the Fourth Amendment. *Id.* at 1216.

We reached a similar conclusion in *Perez Cruz*. Working from an anonymous tip, Immigration and Customs Enforcement (ICE) agents obtained a search warrant for employment-related documents and arrest warrants for eight employees at a Los Angeles factory. 926 F.3d at 1133–34. Nearly 100 armed and uniformed ICE agents entered the

factory and detained all the employees. *Id.* at 1134. They allowed employees with work authorization to leave, but rounded up and interrogated the remaining 130 workers, including Perez Cruz, before bussing them to a detention facility in downtown Los Angeles. *Id.* In his removal proceedings, Perez Cruz challenged his detention on Fourth Amendment grounds. *Id.* We had little difficulty holding that ICE's operation would not have occurred but for the agents' improper motives. Internal memoranda demonstrated that ICE "intended from the outset to turn the execution of [the search and arrest] warrants into quite a different operation than a search for employment records," and that ICE anticipated making 150–200 arrests, bringing two buses and five vans to transport employees to detention facilities. *Id.* at 1133–34. We found that "the central purpose of the raid was not to find documents but to arrest undocumented workers." *Id.* at 1143. In other words, the raid would not have occurred but for ICE's investigatory motive. *See id.* Accordingly, the detention of Perez Cruz violated the Fourth Amendment. *Id.* at 1146.

Finally, our decision in *Alexander v. City & County of San Francisco*, 29 F.3d 1355 (9th Cir. 1994), *abrogated in part on other grounds by County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017), applies these same principles. In that case, health department officials obtained an inspection warrant authorizing them to forcibly enter Henry Quade's house based on complaints of seeping sewage and accumulated refuse. *Id.* at 1357–58. One police officer accompanied the health officials to assist in executing the warrant. *Id.* at 1358. When they arrived at Quade's house, they noticed that Quade had nailed his door shut and barricaded himself in the house. *See id.* As the police officer looked through a window, Quade yelled that he was "going

to get [his] gun and use it." *Id.* At that point, the officer's intention "shifted from assisting in the execution of the warrant to arresting Quade." *Id.* at 1363. The officer "radioed for reinforcements," consisting of a "tactical team" and a "team of hostage negotiators." *Id.* at 1358. After an hour of attempted negotiations, two officers broke through the front door with a battering ram, and seven other officers entered the house with guns drawn. *Id.* Quade appeared at the top of the staircase brandishing a handgun. *Id.* When Quade pointed the gun at the officers and pulled the trigger, the officers opened fire, shooting and killing Quade. *Id.* The executor of Quade's estate brought suit under 42 U.S.C. § 1983 for unlawful entry to effect an arrest. The officers argued that their entry into Quade's residence was justified by the administrative inspection warrant. We disagreed, holding that the officers could not post-hoc "convert[]" the administrative warrant "into an instrument which serves the very different needs of law enforcement officials." *Id.* at 1361. Because the officers' "primary purpose in storming the house was to arrest Quade rather than to assist the health officials in executing the inspection warrant," the officers violated the Fourth Amendment when they entered Quade's home. *Id.* at 1360. What had started as a housing inspection became something very different. As the police captain explained to the press after the incident: "we could have been waiting all day long . . . . we felt that rather than keep traffic blocked up and the streets blocked all day long we would try to go in and arrest him." *Id.* at 1358–59.

In short, we look to the primary purpose of a search conducted under an administrative scheme only when the searching officer had discretion as to who or what to search. The search is unconstitutional only if the search would not have occurred but for the officer's impermissible motive.

* * *

With the foregoing analytical principles in mind, I will now explain how I believe those principles should be applied to the search that occurred at Grey's home.

II

Relying primarily on *Alexander*, the majority concludes that the LASD deputies violated Grey's Fourth Amendment rights the moment they entered his house because their subjective motivation for doing so was to search for evidence of criminal activity. I disagree with that conclusion. In my view, the subjective motivation of the LASD deputies is irrelevant. From their perspective, they were responding to a request to provide police protection for housing officials. Any secondary motives were of no consequence. The search of Grey's home amounted to a discretionless search, bringing their actions within the ambit of cases like *McCarty*, *Tsai*, and *Bowhay*. Thus, the proper inquiry is whether the deputies exceeded the scope of a protective sweep or the inspection warrant once inside Grey's home. And that is an objective inquiry. Because the district court did not address the scope of the search, I would vacate the suppression order and remand to allow the district court to conduct this fact-bound analysis in the first instance.

As I noted above, the subjective intent of a searching officer who conducts a discretionless search pursuant to a lawful administrative scheme is irrelevant unless the officer exceeded the permissible scope of the administrative scheme. *See McCarty*, 648 F.3d at 834–35. At first blush, the protective sweep conducted by the LASD deputies in this case may seem qualitatively different than the discretionless

search of all luggage in *McCarty* or the inventory search in *Bowhay*. But upon closer examination, the search at issue here is essentially the same as those in *McCarty* and *Bowhay* for one reason: the LASD deputies had no discretion.

Under the City's administrative inspection scheme, City health officials have discretion as to who or what to search. Indeed, as Jocelyn Corbett stated, the City attempts to obtain inspection warrants primarily when "there is a reasonable basis to believe that the residence contains code violations." In other words, the City's officials determine whether a residence needs inspection and, if it does, apply for an administrative warrant. As a result, the subjective motivations of the City officials are relevant under *Orozco* and *Alexander*. If the officials' primary goal were to use the administrative inspection warrant to investigate Grey's criminal activity, the search would violate the Fourth Amendment. But Grey does not challenge the City officials' subjective motivations; instead, he challenges only those of the LASD deputies. As a result, I accept as true Corbett's declaration stating she "did not intend for the inspection to aid law enforcement in any way," and that "[n]o one from LASD ever asked me to get an inspection warrant to aid in their criminal investigation." There is no evidence to the contrary.

Unlike the discretion City officials have in seeking an administrative warrant, the LASD deputies here had no discretion. "Every time" the City obtains an inspection warrant, they "have at least one Los Angeles County Sheriff's deputy accompany the inspector to clear the premises." In Grey's case, Corbett requested LASD assistance because she "had concerns for the safety of" the health inspector, and "because it is [the City's] policy to have law enforcement

accompany the City personnel who will be executing the [inspection] warrant." The warrant specifically authorized "Los Angeles County Sheriffs deputies [to] assist in the execution of the Warrant to ensure that interference with same does not occur." The LASD deputies did not choose to search Grey's house based on their own investigation; they were not there on their own initiative. Rather, they merely complied with the City's request for assistance. In short, the search of Grey's house was not the result of an exercise of discretion by the LASD deputies.

*Alexander* does not compel a contrary conclusion. To be sure, *Alexander* also involved law enforcement officers aiding health officials in the execution of an administrative inspection warrant. But in that case, the law enforcement officers "supplanted" the health agency's "mission" once the situation escalated. *Alexander*, 29 F.3d at 1361. The officer accompanying the health officials called in additional reinforcements for the purpose of entering the home to arrest the defendant. *See id.* at 1362. At that point, the police officers were no longer assisting the health officials execute an inspection warrant. Instead, the officers were conducting their own operation, putting their subjective motivations in play. We rightly rejected the officers' post-hoc attempt to justify their entrance into the defendant's house under the guise of the administrative inspection warrant.

The situation here is entirely different. No escalation occurred once the LASD deputies and City health officials arrived at Grey's house. To the contrary, Grey was quickly detained outside, which the deputies had the right to do. *See Dawson v. City of Seattle*, 435 F.3d 1054, 1565–66 (9th Cir. 2006); *Ganwich v. Knapp*, 319 F.3d 1115, 1120–21 (9th Cir. 2003). The deputies then entered the house to conduct a

protective sweep. And as is appropriate during a protective sweep, the City's inspectors did not enter the house until after the sweep was completed—a necessary step for their own protection. The LASD deputies simply did not supplant the City's operation prior to entering the house. Instead, their entrance was in furtherance of the City's execution of the inspection warrant. Thus, *Alexander* has little purchase here.

At bottom, LASD's actions amounted to a discretionless search. Because the search was discretionless, the subjective motivations of the deputies as they entered Grey's house are irrelevant. *See Bowhay*, 992 F.2d at 231. Indeed, under *Bowhay*, it is irrelevant if the deputies had "dual bona fide motives." *Id.* The LASD deputies were lawfully on Grey's premises to protect housing officials by conducting a protective sweep. That is their job—to protect—and we must treat it as nondiscretionary. No police department in the country would have refused to respond to a housing official's request backed by a court-issued inspection warrant. Because LASD deputies had not only a right, but a duty to conduct a protective sweep of Grey's house, the only question is whether the deputies exceeded the permissible scope of a protective sweep incident to execution of the administrative inspection warrant.

The majority says that it does not address the scope of the search. Maj. Op. at 35. But in reaching its conclusion that the search here violated the Fourth Amendment, the majority cannot help but consider whether the officers exceeded the permissible scope of a protective sweep that is conducted in connection with an inspection warrant. For example, the majority faults the deputies for spending fifteen to twenty minutes inside Grey's home because that is arguably inconsistent with the definition of a protective sweep. *Id.*

at 31, 33–34. Similarly, the majority announces a burden-shifting framework under which a search is constitutional if the government demonstrates that the officers' "improper motive did not affect the scope of the search or the manner in which [the] warrant was executed." *Id.* at 32. Rather than affording the government the opportunity to make that showing, however, the majority concludes that the government neither "has shown" nor "could show[] that the execution of the warrant was no more intrusive than it would have been absent LASD's criminal investigatory motive." *Id.* at 34. Thus, despite contrary assurances, the majority considers whether the deputies exceeded the permissible scope and finds that they did.

The majority's inability to avoid addressing the scope of the protective sweep only demonstrates the flaws in its analysis.[8] The burden-shifting framework articulated by the majority confirms that the real question is whether the officers' actions went beyond the permissible justifications for a protective sweep. Indeed, under the majority's test, the search at issue here would be constitutional, even though the deputies' primary goal was to search for evidence of criminal activity, so long as the deputies' objective actions were no more intrusive than necessary to conduct a protective sweep and execute the inspection warrant. That is the exact test used in cases like *McCarty*, *Tsai*, and *Bowhay* to analyze searches that are conducted without discretion. In short, the majority effectively subscribes to the analysis I have

---

[8] We can test the majority's position by asking, "what should LASD have done differently?" Declined to help the housing officials? Recused itself? And what should LASD do in the future when it is asked to support an administrative warrant, if it has previously received complaints about the subject?

articulated, but has substituted an analysis of the deputies' subjective motives for what should be an objective inquiry.[9]

---

[9] Even if we should be analyzing the subjective motivations of the LASD deputies, the majority's conclusion that the deputies had a criminal-investigatory motive does not follow from the facts the majority cites. For example, the majority emphasizes that LASD sent nine deputies to assist the City health officials. Maj. Op. at 31. But why does the presence of nine officers clearly demonstrate a motive to investigate criminal activity in this context? Nine deputies seems like a big group to me, but I am not a law enforcement officer, and that number may well have been justified by the atypical threats posed by Grey and his fortified home. And if the presence of nine deputies clearly demonstrates a criminal investigatory motive, how many deputies should LASD have sent to avoid such a finding? Five? Three? The majority provides no guidance as to what is appropriate. Nor could it, as the Fourth Amendment places no cap on the number of officers that may conduct a protective sweep. In these circumstances, we have no business second-guessing how many officers LASD should have sent.

The majority also cites the fact that the deputies conducting the sweep were the same individuals involved in Grey's criminal investigation. *Id.* at 33. But once the City requested LASD's assistance, the question of which deputies would accompany the health officials is largely irrelevant to why the search took place. In any event, LASD did not have to build a wall between deputies who knew of the complaints against Grey and deputies who did not. *See Abel v. United States*, 362 U.S. 217, 228, 230 (1960) ("[T]o hold illegitimate, in the absence of bad faith, the cooperation between I.N.S. and F.B.I. would be to ignore the scope of rightful cooperation between two [agencies] . . . concerned with enforcement of different areas of law . . . . The test is whether the decision to proceed administratively . . . was influenced by, and was carried out for, a purpose of amassing evidence in the prosecution for crime."). LASD knew that Grey had multiple felony arrests and a conviction for manslaughter, and that neighbors had heard gunshots and seen various firearms, including an AK-47. Thus, LASD's decision to send multiple officers who were involved in Grey's criminal investigation was not just reasonable, it was the smart thing to do. Assigning deputies with no knowledge of the complaints against Grey or his criminal record would have been dangerous and irresponsible.

There is some evidence that the LASD deputies may have exceeded the scope of a protective sweep while inside Grey's house. "A 'protective sweep' is a quick and limited search of premises" that "is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). Yet one deputy testified that they were in Grey's home for fifteen to twenty minutes, and time stamps on photographs suggest the deputies were in the house for up to forty minutes. Additionally, the district court accepted evidence that the deputies may have opened desk drawers and touched and moved some items, which is impermissible during a protective sweep. *See Cuevas v. De Roco*, 531 F.3d 726, 735 (9th Cir. 2008) (per curiam) (holding that by opening "at least one drawer," an officer "exceeded . . . the limits of a lawful protective sweep"). If the LASD deputies' actions went beyond conducting a protective sweep, those actions likely violated the Fourth Amendment. *See McCarty*, 648 F.3d at 836 (noting that the Fourth Amendment is violated when the

---

Finally, the majority faults LASD for "fail[ing] independently to advance its own investigation pending the administrative inspection." Maj. Op. 33. But LASD had already determined that it lacked probable cause for a criminal search warrant. This is a laudable, measured judgment. Why this fact clearly demonstrates an investigatory motive escapes me. In our Fourth Amendment cases, we have never required law enforcement to adhere to a specific time line when conducting a criminal investigation. And for good reason. Law enforcement officials, not judges, are in the best position to determine which investigations to prioritize. Is it possible that LASD took no further investigatory steps because it was hoping to use the inspection warrant to search for evidence of criminal activity? Yes. But equally plausible is the fact that the investigation of Grey was less important than other active investigations, so LASD chose to put Grey's investigation on the back burner. There is no evidence LASD was pushing the City's housing inspectors as a cat's paw to serve its own investigatory purposes.

searching officer's actions are "more extensive and intrusive than necessary" under the governing administrative scheme).

Ultimately, the district court did not consider the scope of the search. I disagree with the majority's decision to implicitly conduct this analysis for the first time on appeal while also considering the subjective motivations of the officers. Thus, I would vacate the suppression order and remand to allow the district court to conduct the appropriate analysis in the first instance.

I respectfully dissent.